## No. 15,776.

DENVER MILK PRODUCERS, INC., ET AL. *v*. INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN AND HELPERS' UNION, ET AL.

(183 P. [2d] 529)

Decided May 19, 1947. Rehearing denied July 7, 1947.

Mr. KENNETH W. ROBINSON, Mr. ROBERT SWANSON, Mr. R. HICKMAN WALKER, for plaintiffs in error.

Mr. PHILIP HORNBEIN, Mr. PHILIP HORNBEIN, JR., for defendants in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, BARBARA LEE, Assistant, Mr. GEORGE K. THOMAS, Assistant, amici curiae.

*En Banc.*

MR. JUSTICE HAYS delivered the opinion of the court.

DURING the month of September, 1945, five cases were filed in the district court of the City and County of Denver, allegedly growing out of the activities of the defendants in the attempt to unionize certain of plaintiffs and their employees engaged in hauling, processing and distributing milk in the Denver area. Said suits were entitled: Denver Milk Producers, Inc., plaintiffs v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers Union, et al., defendants, Case No. A-45099; Harold Hennigh, E. W. Johnson, O. T. Holland and Eston Buster, plaintiffs v. The International Brotherhood, et al., defendants, Case No. A-45091, Div. 1; Carl A. Borgmann and Walter Borgmann, d.b.a. Borg-

mann Bros., L. C. Austin and F. S. Austin, d.b.a. Austin Bros., plaintiffs v. The International Brotherhood, et al., defendants, Case No. A-45106, Div. 1; Joseph Green, plaintiff v. The International Brotherhood, et al., defendants, Case No. A-45112, Div. 2; and Flora A. Beach, et al., plaintiffs v. Milk Drivers' and Dairy Employees' Local Union No. 537, The International Brotherhood, et al., defendants, Case No. A-45223, Div. 3. In the last case mentioned plaintiffs made application for, and were granted, a temporary restraining order, enjoining defendants from the doing of certain things hereinafter mentioned. Upon the issuance of the restraining order in the Beach case, it was agreed by and between all the parties that said order should extend to each and all of said five cases. Since the restraining order was entered in the Beach case, we set forth herein the essential parts of the complaint therein, as follows:

"14. That on or about July 31, 1945 all of the defendants except the Retail Clerks Union and the Bricklayers Union entered into a conspiracy and agreement to prevent the delivery of milk to this Company and other non-union dairies, and to prevent the processing, sale and delivery of said milk by this Company and other dairies to their customers in Denver and in the Denver milk-shed, unless and until this Company, the Carriers, Farmer-Producers and other dairies joined Local No. 537. That in pursuance of said plan they agreed among other things, to do and perform the following acts:

"(a) To employ and train groups of Union men as pickets to carry out any and all orders of the officers of the defendant Teamsters and Drivers' Union;

"(b) To cause said pickets to follow non-union drivers of the Carriers while on their routes collecting milk;

"(c) To prevent individual Farmer-Producers from hauling and delivering any of their own milk products to any dairy in the milk-shed unless such farmer is a member of Local No. 537;

"(d) To prevent any Carrier from employing non-union drivers to work in the milk-shed, and in Denver, and to prevent any such driver from handling any milk therein;

"(e) To cause said pickets to intercept and stop all non-union drivers before they enter the grounds of or at the unloading docks of all dairies, whether union or non-union;

"(f) To order, instruct and stop all union drivers from delivering any milk to non-union dairies;

"(g) To intimidate all non-union Carriers and their non-union drivers from collecting milk from Farmer-Producers and unloading their milk at all dairies, and to accomplish same by brawn, display of force, threats, coercion, force, blockades, interference, mass picketing, fraud, and false representations;

"(h) To intimidate and coerce all Farmer-Producers and dairies which own herds from shipping their milk by non-union Carriers and to require them to change to union Carriers when such union Carriers operate in the territory of such herds.

"(i) To unionize all non-union dairies in the milk-shed and Denver, including this Company, whether their employees desire this action or not;

"(j) To unionize and completely control and dominate the handling of all milk in the Denver area, regardless of the rights, privileges and desires of this Company, the Farmer-Producers, Carriers, drivers, the dairies and their employees, food store employees and the general public.

"(k) To compel employees of all union food stores, including Piggly Wiggly Stores, to refuse to handle non-union milk if the same is delivered to and sold at the stores where they are employed and to picket said stores if it is so delivered and sold.

"(l) To use and employ secondary boycotts in connection with said plan.

"(m) To cause great financial losses to plaintiffs, Farmer-Producers, Carriers and dairies unless and until they join the Union and obey its rules and regulations.

"15. That part of said plan and conspiracy was put into effect from July 31 to August 2, 1945, and then suspended to September 2, when the plan was again inaugurated, and since then the same has been rapidly developed and is daily becoming more and more effective. That in pursuance of said plan defendants have now acted and put into effect the operations necessary to accomplish those portions of the plan as described in paragraph 14, sub-paragraphs (a) to (h) inclusive, (j) to (m) inclusive, and the remainder of the plan will be put into operation in the near future unless enjoined by the order of this court.

"16. That said pickets have been employed and trained and put to work; that they have followed non-union drivers on their routes while collecting milk; have prevented non-union Farmer-Producers from hauling and delivering their own milk to dairies; have prevented non-union drivers from handling milk in the milk-shed; have caused pickets to intercept and stop non-union drivers; have ordered and prevented all union drivers from delivering milk to non-union dairies; have ordered employees of union dairies to refuse to process and handle non-union milk; have intimidated non-union Carriers and non-union drivers from unloading their milk at Denver dairies, and have employed and used brawn, display of force, threats, coercion, force, blockades, interference, mass picketing, secondary boycotts, fraud and false representations in connection therewith; have intimidated and coerced herd owners from shipping milk by non-union Carriers and have required them to change to union Carriers; have caused great financial losses to plaintiffs, Farmer-Producers, Carriers and Dairies.

"17. That among the false and fraudulent representations made by defendants are the following:

"(a) Statements by said pickets to Carriers and drivers that other Carriers or all the other drivers of the Carrier (except the driver accosted), have joined the Union, and for that reason the said driver should join.

"(b) Statements by said pickets that Walter C. Moore, the manager of Denver Milk Producers, Inc. desires that all Carriers and drivers should join the union.

"18. That all of said statements were false, were made with the intent that they be acted upon and they were so acted upon; that in many cases membership was secured by reason of said statements, and all without regard to the rights, privileges and desires of the plaintiffs, Farmer-Producers, Carriers, drivers, dairies, dairy employees, and the public in general.

"19. That the defendants the three Teamsters and Drivers Unions, their officers and members, since September 10th, have directed the following activities against this Company in addition to those enumerated in paragraphs 14 to 18 inclusive:

"(a) They have picketed the docks of this Company where milk is unloaded by the Carriers from entering the dock area and from unloading; have prevented all trucks driven by Union drivers for the Carriers from there unloading and ordered them not so to do, with the result that a large amount of milk consigned by the Farmer-Producers to this Company has been diverted elsewhere and lost to this Company.

"(b) They have demanded that the Company sign a union contract with Local No. 537. That because part of the ownership of the Company is in the estate proceedings in the County Court, the three Teamsters and Drivers Unions prepared and exhibited to the Company a temporary agreement with Local No. 537. This required the Company to abide by all Union rules and regulations until December 31, 1945, when the estate will be closed, and then enter into the regular formal printed contract of the Union. That signing the said temporary agreement would bind the Company to agree to all the

terms of the regular 12-page printed contract and agreement of Local No. 537, which contains among other provisions the following:

" 'Article 1.

" 'All male employees working under the classifications set up in Article 3 and who are subject to the jurisdiction of the Union, shall be members of the Union, except seasonal employees as described in Article 6. Where new employees are hired, not members of the Union, they shall make application to become members within fifteen (15) days. The Union agrees that any new employees of the Employer, coming under the jurisdiction of the Union, as enumerated in Article 3, who are hereafter hired and are not members of the Union, shall upon making application and offering to qualify for membership in the Union, be promptly accepted to membership without prejudice or discrimination unless the applicant is specifically denied membership in the Union by the provisions of the National Constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

" 'It is agreed that the Employer will notify the Union in writing on the first day of regular employment of all employees subject to the jurisdiction of the Union.

\* \* \*

" 'Article 3.

" 'This agreement shall apply only to male employees of the Employer working in the following classifications, and subject to the jurisdiction of the Union:

" '1. Regular route salesmen of Dairy and Supply trucks,

" '2. Special delivery drivers and extra drivers,

" '3. Regular male plant employees, who are employees engaged in the production, or actual handling of daily products.

" '4. Regular farm hands,
" '5. Regular Milkers.

\* \* \*

" 'Article 28.

" '*Term of Agreement.* This agreement shall become effective as of April 1, 1945, and shall remain in full force and effect until April 1, 1948, \* \* \*'

"(c) They have demanded that this Company refuse to accept milk except from Carriers with Union drivers, in violation of the Public Utility regulations and the statutes of this State.

"(d) They have threatened the Company that if it refuses to sign the agreement they will put it out of business.

"(e) They have threatened the Company with secondary boycotts; have demanded that managers and union employees of the Piggly Wiggly union stores refuse to purchase and handle milk from this Company, and have their employees, members of Local No. 7, refuse to do so; and have threatened to picket said stores if purchases of milk from this Company are not stopped at once.

"(f) They have demanded that Union bricklayers, members of Local No. 1, quit work on the boiler building described in paragraph 12 until this Company signs said agreement.

"(g) They have intercepted and attempted to prevent the delivery of coal by The Rio Grande Fuel Company to this Company.

"(h) They have picketed the plant of the Company in aid of a secondary boycott against all Carriers who refuse to sign agreements with Local No. 537, and against all drivers who refuse to join the Union, so as to prevent the delivery of milk to the Company until said Carriers and drivers join the Union, and to force the Company to require said Carriers and drivers to

join the Union before the Company will accept delivery of milk from them.

"20. That the defendant Bricklayers Union joined in the conspiracy and unlawful act of the three Teamsters and Drivers Unions and at the end of work on September 15, 1945 established a secondary boycott against the Company, and said Union Bricklayers quit and abandoned their work on said building. That a picket line had been established against the Company on September 10. That said Union bricklayers had disregarded said picket line and worked on said Company property all of said five days regardless thereof until they joined the said conspiracy and instituted said illegal secondary boycott, which, if continued, will deprive this Company of the use of said boiler house to its great injury and damage.

"21. That on information and belief the Retail Clerks Union has joined or is about to join in the unlawful conspiracy with the other defendants in a secondary boycott against this Company delivering milk to the Denver Piggly Wiggly Stores; and that said threatened action is imminent and is to become effective Friday, September 21, 1945, and if it does, it will effect irreparable damage upon the Company and prevent the sale of its milk to said stores. That as a result its milk will sour, its Farmer-Producers lose their market, and the people of Denver will suffer a severe shortage of milk.

"22. That many of the selected Farmer-Producers who ship their milk to the Company will be lost to it if the same has to be shipped by Union Carriers and the Company alleges on information and belief that many of its Farmer-Producers will go out of business, or ship their milk to other dairies if it signs said agreement.

"23. That on information and belief the scale of wages paid by the Company to its employees is higher than the wages paid by the Union dairies in Denver. That if the Union contract were signed by the Company, its employees stand to lose, out of said wages, the initiation

fees and dues paid to Union No. 537, without any increased pay to cover the same.

"24. That the agreement proposed by the said Unions would require this Company to do an unlawful act and compel its employees to join said Union or lose their positions, and such agreement would be in violation of the Labor Peace Act and common law of this State.

"25. That the contract and agreement demanded by the defendant Teamsters and Drivers Union violate the right of the Company to select its own employees.

"26. That if the proposed contract and agreement of the defendant Local No. 537 were signed by the Company, it would compel the Company to coerce its employees to join the Union and to perpetrate an unfair labor practice, and an interference with, restraint and coercion by the Company in the rights of its employees to join or refuse to join a labor organization.

"27. That none of the defendant Unions nor any of them nor any of their members represent a majority of the male employees of this Company or any of said employees of this Company, and it would be unfair labor practice and unlawful coercion on the part of the Company to accede to the demand of the defendants and sign said contract and agreement.

"28. That if the Company would sign the said temporary or final agreements with Local No. 537, it would be required by the rules and regulations of said Union to refuse to accept milk deliveries from any non-union dairies, and from drivers for Carriers who have not signed Union agreements, and would thus be required to participate in an illegal secondary boycott against said Carriers and drivers.

"29. That there is no labor dispute or controversy of any kind between the Company (employer) and any of its employees, and that none of them are organized in a collective bargaining unit. That no labor dispute as defined by the Colorado Peace Act exists in this action or in the matters alleged herein.

"30. That by the picketing of the Company against non-union Carriers and non-union drivers the defendants are attempting to coerce it to put into effect a secondary boycott against said Carriers and non-union drivers to force them to sign agreements with and join Local No. 537, all of which is illegal under the laws of Colorado.

"31. That the statutes of the State of Colorado give employees the right to refrain from joining any labor organization or from participating in any of its activities; and makes it an unfair labor practice for an employee individually or with others to hinder or prevent, by mass picketing, threats, intimidation, force or coercion of any kind, the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment; to engage in a secondary boycott, or to hinder or prevent, by threats, intimidation, force, or coercion, the obtaining, use or disposition of materials, equipment or services, or to combine or conspire to hinder and prevent, by any means whatsoever, the obtaining, use or disposition of materials, equipment or services.

"32. That said plan and conspiracy and the acts and things done under it, and intended to be done by the defendants is illegal and in violation of Article II, Section 3 of the Constitution of the State of Colorado, the Statutes of the State, and the Rules and Regulations of the Public Utility Commission of Colorado.

"33. That unless restrained by this court the illegal actions of the defendants will cause many of the Farmer-Producers to stop their shipments of milk to the Company; will prevent practically all of the Farmer-Producers from so doing; will prevent the Company from completion of its badly needed boiler house; will prevent all Carriers with Union Drivers from making milk deliveries to the Company; will prevent deliveries of coal and needed supplies to the Company; will prevent the Company from selling to Piggly Wiggly Stores and

other companies; and will completely ruin and destroy the business of the Company.

"34. That the Company has suffered great damages, the amount of which cannot as yet be ascertained, and will suffer irreparable damage unless the defendants and each of them are restrained by order of this court.

"35. That there is no plain, speedy or adequate remedy at law, and the continued conduct of defendants would require a multiplicity of suits."

Thereupon the plaintiffs prayed for a temporary restraining order, injunction, and damages. Said complaint in the Beach case was presented to the trial court and upon an ex parte application, Judge Steele issued a restraining order, which, omitting formal parts thereof is as follows:

"At this day come the plaintiffs by their attorney, and the said plaintiffs having filed their complaint in our District Court against the above named Defendants praying for a restraining order against said Defendants, requiring them to refrain from certain acts, in said complaint, and hereinafter more particularly mentioned. On reading the said complaint in this action, and it satisfactorily appearing to the Court therefrom, that it is a proper case for a restraining order, and that sufficient grounds exist therefor, and the necessary and proper undertakings having been given:

"It is therefore ordered by the Court that until the further order of said Court, you and each and every of you, your and each of your servants, agents, attorneys, employees, and all persons acting under the control, authority or direction of you, do absolutely refrain from and desist from:

"1. In any manner establishing and maintaining a secondary boycott against the products of Beach Milk Co., at any of the Piggly Wiggly stores in Denver, Arvada and Aurora, Colorado, or at any other store in Colorado which purchases the products of the Company for resale to its customers.

"2. In any manner establishing and maintaining pickets against or about the products of the Beach Milk Co., and against said Beach Milk Co. at or about any of said stores, and in any manner publishing it as unfair to union labor to the customers of said stores, and in any manner preventing the delivery of the products of said Company to said stores.

"3. In any manner interfering with the delivery of the products of the Company to said Piggly Wiggly or other stores.

"4. In any manner, as members of Retail Clerks Union No. 7, American Federation of Labor, refusing to handle and sell the products of said Company, when delivered at the Piggly Wiggly or other stores which purchased the said products prior to September 20, 1945.

"That from the verified complaint and verified motion the court defines the injury claimed by Beach Milk Co., to be the loss of the business of the Piggly Wiggly Stores to the amount of about $535.10 per day; the permanent loss of the same; the spoilation, waste and destruction of its milk products because of the perishable quality and necessity of an immediate market; the inability of the Company in a few days or weeks to find customers to replace the said Piggly Wiggly; the loss of its Farmer-Producers and the milk from their fine dairy herds if the Company cannot market their products; that about half of its production goes to Piggly Wiggly Stores; and the utter destruction of the business of the Beach Milk Co., if the alleged illegal acts of the defendants and each of them continue.

"That if said facts are true, the injuries are irreparable, and plaintiffs would suffer immediate and irreparable injury, loss and damage before notice can be served and a hearing had.

"That this injunction is issued under the allegations of the complaint that the defendants seek to coerce the Plaintiff to sign an unlawful contract, and its alleged acts and conduct are to enforce such unlawful act.

"That the bond of the plaintiffs on this temporary restraining order without notice is fixed at the sum of $1000.00, and the same, signed by plaintiffs and a surety company, has been tendered to the court and approved by it.

"This case is set for hearing on the injunction issues for October 1, 1945 at 10 A.M. and shall be in full force and effect until that date unless such time is changed by the court.

"This order is issued this 21st day of September, 1945, at 9:15 A.M."

The above restraining order was entered as aforesaid in each of the other four cases and by successive orders of the district court and supersedeas here, the same has been and now is in full force and effect. It was further stipulated that in so far as the hearing on the injunctions was concerned, that the cases should be consolidated, but in the event the restraining order was made a permanent injunction, the question of damages should be tried separately in each case.

The consolidated cases were tried before Judge Walsh, and at the conclusion of plaintiff's testimony the defendants interposed a motion to dismiss which was denied, and at the conclusion of all the evidence the motion was renewed and sustained.

The trial court in its ruling upon said motion to dismiss, stated that it "has come to the conclusion that this case can be decided by an answer to this question:

"Can the State pass an act defining a 'labor dispute' so as to enjoin a union from the commission of certain acts defined to be unfair labor practices, when the purpose is to urge employer and employees to join a union, and where there exists no employer-employee relationship?

"If so, many of the cases cited by counsel for the plaintiffs apply and the temporary injunction heretofore issued should be made permanent, and the question of damages determined on further trial. On the other hand,

if the State is prohibited from so defining a labor dispute that the commission of certain acts deprives the defendants of certain fundamental rights secured to them by the Constitution of the United States, then the cases cited by counsel for the defendants apply and the motion to dismiss should be granted."

For a proper understanding of the above quoted question it is necessary to examine the act mentioned by the court. Section 94 (16), chapter 97, 1946 Cumulative Supplement to 1935 Colorado Statutes Annotated (Section 16, chapter 131, page 411, S.L. '43) provides as follows:

"Except as otherwise provided in this subdivision, no court, nor any judge or judges thereof, shall have jurisdiction to issue in any case involving or growing out of a labor dispute, as herein defined, any restraining order or temporary or permanent injunction which in specific or general terms prohibits any person or persons from doing, whether singly or in concert, any of the following acts:

"(1) Ceasing or refusing to perform any work or to remain in any relation of employment regardless of any promise, undertaking, contract or agreement to do such work or to remain in such employment;

"(2) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 94 (17) of this subdivision;

"(3) Paying or giving to, or withholding from any person any strike or unemployment benefits or insurance or other moneys or things of value;

"(4) By all lawful means aiding any person who is being proceeded against in, or is prosecuting any action or suit in any court of this state;

"(5) Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, without intimidation or coercion, or by any

other method not involving fraud, violence, breach of the peace, or threat thereof;

"(6) Ceasing as an organization to patronize any person with which such organization has a labor dispute or to employ any person or persons;

"(7) Assembling peaceably to do or to organize to do any of the acts heretofore specified or to promote lawful interests;

"(8) Advising or notifying any person or persons of an intention to do any of the acts heretofore specified;

"(9) Agreeing with other persons to do or not to do any of the acts heretofore specified;

"(10) Advising, urging, or inducing without fraud, violence, or threat thereof, others to do the acts heretofore specified, regardless of any such undertaking or promise as is described in section 94 (17) of this subdivision;

"(11) Doing in concert of any or all of the acts heretofore specified on the ground that the persons engaged therein constitute an unlawful combination or conspiracy."

The definition of "labor dispute" to which the court in its opinion refers and which term appears in the above statute, is set forth in paragraph 7, section 94 (2) (Section 2 [7], c. 131, p. 395, S.L. '43) of the act, as follows:

"The term 'labor dispute' means any controversy between an employer and such of his employees as are organized in a collective bargaining unit, concerning the rights or process or details of collective bargaining. The entering into of a contract for an 'all-union agreement' or the refusal of an employer to enter into an 'all-union agreement' shall not constitute a labor dispute. It shall not be a labor dispute where the disputants do not stand in the proximate relation of employer and employee. No jurisdictional dispute or controversy between two or more unions as to which of them has or shall have jurisdiction over certain kinds of work; or as to which of two or more bargaining units constitute the collective bar-

gaining unit as to which the employer stands impartial or ready to negotiate or bargain with whichever is legally determined to be such bargaining unit, shall constitute a labor dispute.

"The general right of an employer to select his own employees is recognized and shall be fully protected. It shall not constitute a labor dispute if an employer discharges, or refuses to employ, an employee on account of incompetence, neglect of work, unsatisfactory service or dishonesty, but the discharge of an employee, or the refusal to employ an employee, shall constitute a labor dispute only when such discharge or refusal to employ is founded upon membership in a union or labor organization or activity therein or when such discharge or failure to employ is in violation of a contract."

In order properly to determine whether or not the trial court erred in not making the temporary restraining order a permanent injunction, we deem it necessary to examine the restraining order to ascertain whether or not it violated the statute (§94, 16, Supra). The order restrained the defendants in substance from doing the following things:

(a) Establishing and maintaining a secondary boycott on Piggly Wiggly stores; (b) Placing pickets around said stores; (c) Publishing that the sale of Beach Milk products by said stores was unfair to labor; (d) From preventing or interfering with the delivery of the Beach products to said stores; and (e) From refusing to handle and sell said products as members of the Retail Clerks' Union.

By the act above mentioned, the court is prohibited from restraining the commission of eleven separate and distinct acts "in any case involving or growing out of a labor dispute, as herein defined * * *." There is no prohibition against restraining those same acts in any other kind of a dispute, and no proscription against restraining the commission of acts even in a *labor dispute* other than those acts expressly set forth in the statute.

Is this a *"case involving or growing out of a labor dispute"*? The answer, of course, must be found in the application of the legislative definition, supra.

The definition may be considered as consisting of two propositions: (1) What *is* a labor dispute; and (2) what *is not* a labor dispute.

■ What *is* a labor dispute may be defined in substance to mean:

1. "Any controversy between employer and such of his employees as are organized in a collective bargaining unit, *concerning the rights or process or details of collective bargaining"*;

2. The refusal to employ or the discharge of an employee when such is founded upon membership in a union or labor organization or activity or where such discharge or failure to employ is in violation of a contract.

What *is not* a labor dispute can be said in substance to be:

1. Entering into or refusing to enter into an "all-union agreement";

2. Where the disputants do not bear the relationship of employee and employer;

3. Jurisdictional disputes between unions;

4. Disputes as to with which of two or more rival bargaining units the employer must negotiate, where employer is willing to negotiate with whichever is legally determined to be the bargaining unit;

5. Refusal to employ or the discharge of an employee on account of incompetence, neglect of work, unsatisfactory service, or dishonesty;

6. Any controversy between an employer and such of his employees as are organized in a collective bargaining unit, which does not concern "the rights or process or details of collective bargaining."

Further light upon the question as to whether or not this suit grew out of a *labor dispute* within the purview

of the act can be obtained by an examination of the following excerpts from the findings of the trial court on application for permanent injunction, to wit:

*The Beach Milk Company, plaintiff in Case No. A-45223, Division 3,* is a non-union dairy. It was contacted to join the union some six or eight months prior to the time the present controversy arose, but was not interested at that time. On September 1, 1945, the Beach Milk Company had a production of about 2200 gallons of milk, employed 27 persons, of whom 21 would be eligible for union membership. At the time this controversy arose they were in the process of erecting a new boiler plant which it was hoped would be in operation by November 1, 1945. The company sells milk to restaurants, hotels, the Piggly-Wiggly Stores and the Army. Its two largest customers are the United States Government, which takes 1000 gallons of milk daily for Buckley Field, and some 24 to 26 Piggly-Wiggly stores, supplying practically the entire supply of milk retailed by these stores. F. Leonard Beach is the Manager of the Company, which was originally a co-partnership composed of his father and mother. The father is now deceased and his estate is in the course of administration.

"The Company was contacted by Messrs. Coffey and Christol, Union representatives, on September 10, 1945, and F. Leonard Beach was advised if he did not sign a union contract his plant would be picketed and pressure would be brought to bear on the Piggly-Wiggly Stores to have them discontinue purchasing Beach Milk. Up to this time the Company was getting both 'union' and 'non-union' milk. After unsuccessful negotiations to sign up the Company and its employees in the union, the plant was picketed—the picket carrying a sign with the legend 'Unfair to Local No. 537.'

"Negotiations with union representatives extended over a number of days and also with Mr. Nathan Creamer, attorney for the Beach estate. At one of these sessions Mr. Beach asserted that Mr. Christol had said,

in answer to a question by Mr. Beach as to what would happen if he did not join the union, 'the union will put forth every effort to destroy the Beach Milk Company as a business.' Mention of a secondary boycott was implied by a mention of the union's power with the Piggly-Wiggly Stores. Picketing did start on the Beach plant on September 10, 1945 and continued until the temporary restraining order was issued by Judge Steele on September 21, 1945. This interference on the part of the union caused the Company to lose producer-shippers, such as those that came over the Rein truck line which became unionized and would not deliver to his plant. The Company also maintains that it had the problem that if it did become unionized it would lose farmer-producers who had evinced animosity towards unions and union dairies. From September 10th to 21st many of the company's regular shippers were cut off and the company had to obtain milk of an inferior grade from Johnstown to make up some of the deficiency. There was also interference with the union bricklayers working on the boiler plant, who ceased employment and the Company had trouble one time in getting its coal promptly delivered by the Rio Grande Fuel Company, which employs union drivers.

"Under the Army contract the Beach Company is obligated to furnish a special grade of milk. The farmer-producer receives a bonus for the milk produced by him and in turn the Army was permitted to buy this milk from the Beach Company at a one-half cent increase in price per quart above the OPA ceiling price. To obtain this high grade quality milk, the Beach Company installed a special inspection system whereby the herds of the farmer-producers were regularly inspected and scientifically improved methods of production imposed on the farmer-producers and insisted on. Loss of the Piggly-Wiggly and Army business would have been serious to the Company because it would have had a large

supply of milk for which there would have been no outlet.

"There was no denial on the part of the union that it had had negotiations with Mr. Beach looking to unionizing the plant, that it had established a picket line, that a number of union representatives had congregated across the street one day, and that the truck drivers delivering the milk to the dairy were contacted in an attempt to get them to join the union, but stated that all of this was done in a peaceable manner, without any disturbance and with no threat of violence.

"During this period of time the Almhurst Dairy and the Stearns Dairy suffered interference. With respect to the Almhurst Dairy, it was a non-union dairy and, like the Beach Milk Company, was engaged in construction work under a union contractor employing union labor. Lenus Alm is the owner of the Almhurst Dairy, located at 190 West Nevada and has seven employees. It is a member of the Denver Milk Producers association and, as stated, was a non-union dairy prior to September 20th or 21st, since which time it has become unionized. Sometime in September, 1945, there were three union bricklayers working on the addition which was to cost somewhere in the neighborhood of $40,000.00 and about four more weeks were needed to complete the building. His employees had never asked whether they should join or not join the union. Union representatives Coffey and Christol contacted him sometime before September 17th. They had a union contract and wished him to sign, and advised him at that time that they had Beach about signed up. Tuesday, September 18, 1945, he was again contacted and asked if he was ready to sign up and he asked Coffey and Christol to come to his home to discuss the matter because they could discuss it more quietly. In the meantime he had talked to James Logan and Mr. Hall of the Colorado Employers Council and had advised them that he was going to be picketed unless he joined the union and wanted their advice. His place was pick-

eted, so he called Coffey from Logan's office and Coffey promised to take the picket off if he signed, so he did sign a union contract on September 20th or 21st, but frankly states that he would not have signed if the union bricklayers had not struck. He maintained that he was paying more than the union scale to his employees. He also contacted Mr. Moore of the Denver Milk Producers association, who advised him he did not have to sign with the union and Mr. Moore thought he could get milk into his plant without his signing. In his discussions with his employees about joining the union some said they would and some said they would not.

"With respect to the Stearns Dairy, on April 3, 1945, they had signed a contract with the union, but certain conditions of the contract as to wages and commissions had not been agreed upon. These issues had been submitted to a panel of the National War Labor Board, but the Board had failed to issue directive order and the matter had been referred back to the employer and employees. Mr. Hillmeyer, President of the Stearns Dairy, was contacted one morning somewhere between 4:30 and 5:00 o'clock A.M., and advised that if he did not sign a union contract his milk would not go out. After some bickering, he acceded to the demands of the union. The Stearns Dairy used to receive milk delivered by non-union carriers, and upon being advised that his employees could and would not work on this milk he was compelled for over a week to haul his own milk. Mr. Coffey, the union representative, admitted that there was a controversy with the Stearns Company and with respect to the refusal of the drivers to deliver milk on September 7, 1945. Mr. Coffey claimed that Mr. Hillmeyer had broken an appointment to settle the matter, but that the matter was finally settled, namely, on the morning of September 7, 1945, by Mr. Hillmeyer agreeing to the union's conditions, namely, paying back pay of $100.00 and $210.00 per month to the drivers.

"In carrying out the threat of a secondary boycott

made by the union representatives to the Beach Milk Company, various union officials, namely, Coffey, Christol, Pixler, Dinsmore and Maxwell (the latter representing the Retail Clerks' Union) contacted Mr. E. H. Lambotte, President of the Piggly-Wiggly Stores Company, which operates under a franchise from the main office with headquarters in Atlanta, Georgia. Some nine owners or managers of Piggly-Wiggly stores were also contacted. Mr. Lambotte discussed the milk situation with Mr. O'Neal, Mr. Coffey and Mr. Voorhies (the latter a representative of the Bakery Drivers Union). Mr. Lambotte was advised on September 11, 1945, that the union was having trouble with the Beach Milk Company and he was requested to use his good offices in trying to persuade Beach to sign a union contract, and he was advised that if Beach refused it might be necessary to establish a secondary boycott of the Piggly-Wiggly stores. Lambotte did call Beach. On September 19, 1945, Coffey advised Lambotte that the union was going to picket the Piggly-Wiggly stores. Coffey was considerate of their position and advised him to have the stores make their arrangements for a milk supply.

"The Company has no special policy as to whether its stores are union or non-union, leaving it to the individual store whether to unionize or not. Lambotte was advised by Mr. O'Neal that no picket line would be established until they got another supply. However, on Thursday, September 20th, he was advised that the stores would be picketed the next day, so he advised Beach not to deliver and also contacted every Piggly-Wiggly store as to the situation. The issuance of the temporary restraining order obviated further action, as Beach was allowed to continue deliveries. He states that Piggly-Wiggly relations with the union had been friendly and all of the negotiations he had were conducted in a businesslike manner without threats. He was confident no store would accept Beach milk if it was picketed.

"As stated, some nine Piggly-Wiggly owners and man-

agers were contacted prior to September 20th, four of them being union and five non-union stores. They were advised not to accept Beach milk and there were instances where the union representatives were angry because certain owners had accepted milk after being advised not to do so. In one instance William White, manager of Piggly-Wiggly store at 1211 East Alameda, was advised by Mr. Dinsmore on September 20, 1945, that there was trouble with Beach and stated to Mr. White, 'I am telling you now if you accept milk tomorrow from Beach we will slap a picket on the store.' The Piggly-Wiggly stores got practically all of their supply of milk from the Beach Milk Company."

We have taken the above excerpts from the findings of the trial court as they pertain to the Beach case because, as above stated, the temporary restraining order set forth in this record was issued in the Beach case, and, by stipulation extended to the other cases. It would unnecessarily lengthen this opinion to quote all the facts contained in the findings of the trial court pertaining to the other cases, in view of the stipulation of counsel that the facts are sufficiently similar to justify the issuance of the temporary restraining order in each of the cases, and especially in view of the following statements of the trial court in its findings:

"These cases were argued and submitted together and may be disposed of in a single opinion because the law involved governs the general factual situation existing in all of the cases.

\* \* \*

"The situation existing in each case may be gathered from the foregoing general statement of facts. Of course, some of the facts overlap in the various cases, while other facts are pertinent only to a particular case. However, in general the situation must be viewed as constituting one controversy."

From the above and foregoing it is apparent, and we so find, that Judge Walsh, in his findings on the hearing

on injunction, reached the proper, logical and inescapable conclusion that if the definition of "labor dispute" is valid "many of the cases cited by counsel for the plaintiffs apply and the temporary injunction heretofore issued, should be made permanent, and the question of damages determined on further trial."

The principal question herein is whether or not the legislative definition of "labor dispute" set forth in section 2, paragraph 7, chapter 131, Session Laws 1943, is valid. In this connection the trial court said: "The court feels that the definition of a 'labor dispute' as defined in the Colorado Labor Peace Act of 1943, is too strained and narrow. That if the conduct of defendants can be classified so as to make them guilty of unfair trade practices under that narrow definition, and if this definition be permitted to stand, that there has been an invasion of their constitutional rights."

To reach a proper conclusion on the above question, section 16 of the act must be considered with said paragraph 7 of section 2. When so considered and taken together, those sections mean that courts of Colorado are divested of all jurisdiction to grant restraining orders or injunctions which prohibit any person from doing certain specific things therein mentioned "in any case involving or growing out of a 'labor dispute,' as herein defined."

In the absence of any statute on the subject there is no restriction on the courts in granting restraining orders or injunctions in any case. It is only in cases involving "labor disputes" that the court does not have jurisdiction to grant such orders. The statute does not take away any rights from defendants, but bestows upon them additional rights in "labor disputes" not theretofore possessed. It creates a defense in labor disputes against actions for restraining orders and injunctions not permitted in other disputes. The gist of the defendants' argument is that the statute is void and unconstitutional because it is not more generous. The same argument

could be advanced against the Workmen's Compensation Act of Colorado because it allows fourteen dollars a week for temporary total disability instead of awarding a larger sum. There is no constitutional right to have an act passed by the legislature divesting courts of jurisdiction in specific cases and no one has a constitutional right to a repeal of said act. The legislature created the defense and by the same token can take it away. If the act is held invalid, as defendants ask, the statutory defenses permitted in labor disputes would be eliminated and such controversies controlled by the general rules of this court as in other cases. That is not what the defendants really want. They seek to have the definition of "labor dispute," so liberalized as to include a larger field wherein no injunction may issue. Naturally we have no power or authority to legislate upon the subject and such arguments should be addressed to the general assembly and not to this court.

■ Unless the Constitution in express terms or by necessary implication limits it, the legislature may exercise its sovereign power in any way which in its judgment will best subserve the general welfare. *People v. Richmond,* 16 Colo. 274, 26 Pac. 929; *In re Kindergarten Schools,* 18 Colo. 234, 32 Pac. 422.

■ The legislature may enact any law not expressly or inferentially prohibited by the Constitution of the state or nation. *Mauff v. People,* 52 Colo. 562, 123 Pac. 101.

It has many times been held by this court that the legislature has plenary power to legislate, subject only to limitations of state and federal Constitutions. *Colacino v. People,* 80 Colo. 417, 252 Pac. 350; *People, ex rel. v. McNichols,* 91 Colo. 141, 13 P. (2d) 266; *Metzger v. People,* 98 Colo. 133, 53 P. (2d) 1189.

■ An "act is not unconstitutional because it changes the rule of public policy." *Rifle Potato Growers Ass'n v. Smith,* 78 Colo. 171, 240 Pac. 937.

 Courts should not legislate, neither should they destroy legislation when by careful and conservative decision legislative enactments may be upheld, and any unnecessary overthrow of an act of the general assembly by judicial decision is as much a usurpation of legislative power as an attempt at affirmative legislation. *In re House,* 23 Colo. 87, 46 Pac. 117, 33 L.R.A. 832; *Lewis v. Parker,* 4 Colo. Law Report 300.

 The questions of the wisdom, justice, policy, or expediency of a statute are for the legislature alone and not for the courts. *Schwartz v. People,* 46 Colo. 239, 47 Colo. 483, 104 Pac. 92; *Martin v. People,* 69 Colo. 60, 168 Pac. 1171; *Chicago Title & Trust Co. v. Patterson,* 65 Colo. 534, 178 Pac. 13.

In *American Federation of Labor v. Reilly,* 113 Colo. 90, 155 P. (2d) 145, the whole act, chapter 131, S.L. '43, was challenged as to its legality, and this court, on review, held that sections 20 and 21 of said act were invalid in their entirety, and that certain other minor provisions which are closely related to and dependent upon said sections, were likewise invalid, and we refused to pass upon the constitutionality of other sections of act.

A controversy, similar in many respects to the instant one, was considered by the Supreme Court of the United States in the recent case of *United States v. United Mine Workers and John L. Lewis,* 67 Sup. Ct. 677, 91 L. Ed. 595, decided March 6, 1947. That case involved the Norris-LaGuardia act of congress, which is very similar and in many particulars identical to the Colorado Labor Peace Act. Section 4 of the Norris-LaGuardia act provided: "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:" Immediately following the above is set forth specific acts

which the courts are prohibited from restraining or enjoining.

The petitioner in the above case made application to the United States Court of Appeals for the District of Columbia for an order restraining the commission of certain acts, and the court ordered among other things: "That the defendants and each of them and their agents, servants, employees, and attorneys, and all persons in active concert or participation with them, be and they are hereby restrained pending further order of this court from permitting to continue in effect the notice heretofore given by the defendant, John L. Lewis, to the Secretary of Interior dated November 15, 1946; * * * and from coercing, instigating, inducing, or encouraging the mine workers at the bituminous coal mines in the Government's possession, or any of them, or any person, to interfere by strike, slow down, walk out, cessation of work, or otherwise, with the operation of said mines by continuing in effect the aforesaid notice or by issuing any notice of termination of agreement or through any other means or device. * * *"

Thereupon the mine workers and Lewis filed a motion —as did the defendants here—to vacate and discharge the restraining order upon the grounds:

"(1) The temporary restraining order is void in that this case involves and grows out of a labor dispute. Under the provisions of the Norris-LaGuardia act (47 Stat. 70) and the provisions of section 20 of the Clayton act, 38 U. S. Stat. C. 323, p. 730, 29 U.S.C.A., §52, this Honorable Court is without jurisdiction over the subject-matter of this cause.

* * *

"(5) The temporary restraining order is beyond the jurisdiction of this Honorable Court and therefore void because it contravenes the First, Fifth and Thirteenth Amendments to the Constitution of the United States."

The motion of the mine workers and Lewis to discharge and vacate the temporary restraining order was

denied by the trial court. The court held in substance that the case did not involve or grow out of a labor dispute within the purview of the Norris-LaGuardia act and that the restraining order did not contravene the First, Fifth and Thirteenth Amendments to the United States constitution. In affirming the judgment of the trial court, the United States Supreme Court said: "If we examine sections 4 and 13, on which defendants rely, we note that they do not purport to strip completely from the federal courts all their pre-existing powers to issue injunctions, that they withdraw this power only in a specified type of case, and that this type is a case 'involving or growing out of any labor dispute'."

While the above case was decided upon questions not presented here, it is pertinent to observe that all parties assumed that the Norris-LaGuardia act was in all respects valid, and apparently its validity was conceded.

One of the principal points upon which the above decision is predicated is that the word "person" was not broad enough to include the government and therefore that the Norris-LaGuardia act did not apply. There are many statements by the court throughout the opinion which clearly indicate that the question as to whom the act should apply, and as to whether the scope thereof should be narrow or broad, is within the exclusive province of Congress.

In the course of the opinion in the United Mine Workers case, in speaking of the effect the Norris-LaGuardia act had on the Clayton Act, it was pointed out that it had held in a former case "that the Norris-LaGuardia act 'still further * * * [narrowed] the circumstances under which the federal courts could grant injunctions in labor disputes'". Under the circumstances, no one could seriously contend that the Clayton act was unconstitutional or invalid because it was more liberal than the Norris-LaGuardia act or that the latter was invalid and unconstitutional because it was narrower than the former.

Defendants in the present case, however, contend in substance that if the restraining order is made permanent, they will be deprived of their rights under the First, Thirteenth, and Fourteenth Amendments to the Constitution of the United States. As noted above, defendants in the United Mine Workers and Lewis cases made the same contention but the United States Supreme Court held otherwise, and concluded: "We have examined the other contentions advanced by the defendants but have found them to be without merit. The temporary restraining order and the preliminary injunction were properly issued, and the acts of the district court in these respects are affirmed. * * *" The "other contentions" mentioned by the court includes the one made by the defendants that the restraining order "contravenes the First, Fifth and Thirteenth Amendments to the Constitution of the United States.

Upon the general subject of the validity of statutes similar to the Colorado Labor Peace Act and the Norris-LaGuardia act, there is an extensive note in 124 A.L.R., 752, supplementing earlier annotations on the subject, in which the author says: "The cases decided since the publication of the last annotation on the present subject, in 120 A.L.R. 316, seem to concern themselves principally with the operation and effect of the various statutes restricting the remedy of injunction in industrial disputes, particularly dealing with the questions whether the controversy in question is of the character or involves the parties contemplated by the statute in its restrictive application. *The validity of such statutes generally seems to be accepted without question.*"

On February 19, 1947—after the briefs were filed in the present case—the Supreme Court of Washington rendered a decision in *Swenson v. Seattle Central Labor Council* (Wash.), 177 P. (2d) 873, which is very significant in the present controversy because it discusses many of the important cases cited and relied upon in the briefs herein; it answers many constitutional questions herein

raised; it clarifies the law as to picketing; and because of the similarity of the facts to those in the instant case will be helpful to the trial court on further proceedings. We quote, with approval, from the opinion as written by Justice Schwellenbach:

"Finally, it is contended that, regardless of any statute, the men had an absolute right to peacefully picket as an exercise of the right of free speech guaranteed them under the Federal constitution. Amend. I. We have read all the decisions of the United States Supreme Court on this subject commencing with Thornhill v. State of Alabama, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093, through Carpenters and Joiners Union of America v. Ritter's Cafe, 315 U.S. 722, 62 S. Ct. 807, 808, 86 L. Ed. 1143. In the latter case, the respondent had made an agreement with a contractor named Plaster for the construction of a building in Houston, Texas. Plaster employed nonunion carpenters and painters in the work. The respondent was also the owner of a cafe, a mile and a half distant from the building under construction. The new building was wholly unconnected with the cafe. All the restaurant employees were members of the Hotel and Restaurant Employees International Alliance, Local 808. There was no controversy between respondent and the restaurant employees. The carpenters' and painters' unions had no quarrel with respondent over his operation of the cafe. No carpenters or painters were employed there.

"But because Plaster employed nonunion labor in the construction of a building a mile and a half away, members of the unions picketed the respondent's cafe. Walking back and forth in front of the restaurant, a picket carried a placard which read: 'This place is Unfair to Carpenters and Joiners Union of America, Local No. 213, and Painters Local No. 130, Affiliated with American Federation of Labor.' Later, the wording was changed as follows: 'The Owner of This Cafe Has Awarded a Contract to Erect a Building to W. A. Plaster Who is

Unfair to the Carpenters Union 213 and Painter Union 130, Affiliated With the American Federation of Labor.'

"The Texas court found that Ritter's Cafe was picketed 'for the avowed purpose of forcing and compelling plaintiff [Ritter] to require the said contractor, Plaster, to use and employ only members of the defendant unions on the building under construction in the 2800 block on Broadway.' Contemporaneously with this picketing, the Restaurant Workers Union, Local No. 808, called Ritter's employees out on strike and withdrew the union card from his establishment. Union truck drivers refused to cross the picket line to deliver food and other supplies to the restaurant. The effect of all this was 'to prevent members of all trade-unions from patronizing plaintiff's cafe, and to erect a barrier around plaintiff's cafe, across which no member of defendant-unions or an affiliate will go.'

"The Texas court enjoined this procedure, but the decree forbade neither picketing elsewhere (including the building under construction by Plaster) nor communication of the facts of the dispute by any means other than the picketing of Ritter's restaurant.

"On page 724 of 315 U.S., on page 808 of 52 S. Ct., 86 L. Ed. 1143, the court stated:

" 'The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both.

" 'The task of mediating between these competing interests has, until recently been left largely to judicial

lawmaking and not to legislation. "Courts were required, in the absence of legislation, to determine what the public welfare demanded, whether it would not be best subserved by leaving the contestants free to resort to any means not involving a breach of the peace or injury to tangible property, whether it was consistent with the public interest that the contestants should be permitted to invoke the aid of others not directly interested in the matter in controversy, and to what extent incidental injury to persons not parties to the controversy should be held justifiable." Mr. Justice Brandeis in Truax v. Corrigan, 257 U.S. 312, 363, 42 S. Ct. 124, 141, 66 L. Ed. 254, 27 A.L.R. 375. The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. See Mr. Justice Holmes in Aikens v. [State of] Wisconsin, 195 U.S. 194, 205, 25 S. Ct. 3, 49 L. Ed. 154, and Mr. Justice Brandeis in Truax v. Corrigan, supra, 257 U.S. at page 372, 42 S. Ct. [124] at page 144, 66 L. Ed. 254, 27 A.L.R. 375; Dorchy v. [State of] Kansas, 272 U.S. 306, 311, 47 S. Ct. 86, 87, 71 L. Ed. 248, and Senn v. Tile Layers Protective Union, 301 U.S. 468, 481, 57 S. Ct. 857, 863, 81 L. Ed. 1229. But the petitioners now claim that there is to be found in the Due Process Clause of the Fourteenth Amendment a constitutional command that peaceful picketing must be wholly immune from regulation by the community in order to protect the general interest, that the states must be powerless to confine the use of this industrial weapon within reasonable bounds.

" 'The constitutional right to communicate peaceably to the public the facts of a legitimate dispute is not lost merely because a labor dispute is involved. Thornhill v. [State of] Alabama, 310, U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093, or because the communication takes the form of picketing, even when the communication does not concern a dispute between an employer and those directly

422

employed by him. American Federation of Labor v. Swing, 312 U.S. 321, 61 S. Ct. 735, 85 L. Ed. 1145. But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain. Whenever state action is challenged as a denial of "liberty," the question always is whether the state has violated "the essential attributes of that liberty." Mr. Chief Justice Hughes in Near v. [State of] Minnesota, 283 U.S. 697, 708, 51 S. Ct. 625, 628, 75 L. Ed. 1357. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies "to promote the health, safety, morals, and general welfare of its people * * *. The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise." Id., 283 U.S. at page 707, 51 S. Ct. 625, 75 L. Ed. 1357. "The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side." Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S. Ct. 529, 531, 52 L. Ed. 828, 14 Ann. Cas. 560.

" 'In the circumstances of the case before us Texas has declared that its general welfare would not be served if, in a controversy between a contractor and building workers' unions, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder. The precise question is, therefore, whether the

Fourteenth Amendment prohibits Texas from drawing this line in confining the area of unrestricted industrial welfare. * * *

" 'It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing —anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose.

" 'In forbidding such conscription of neutrals in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the states. We hold that the Constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants.' Thornhill v.

[State of] Alabama, 310 U.S. 88, 103, 104, 60 S. Ct. 736, 745, 84 L. Ed. 1093.

"The United States Supreme Court has, by these cases, established this rule: Peaceful picketing is an exercise of the right of free speech. Organized labor has the right to communicate its views either by word of mouth or by the use of placards. This is nothing more nor less than a method of persuasion. But when picketing ceases to be used for the purpose of persuasion—just the minute it steps over the line from persuasion to coercion—it loses the protection of the constitutional guaranty of free speech, and a person or persons injured by its acts may apply to a court of equity for relief.

"The facts in this case convince us that the picketing complained of did not constitute an exercise of free speech as contemplated by our founding fathers. Neither was it a means of communicating the facts of a labor dispute as interpreted by the United States Supreme Court. The National Labor Relations Board had, by order, designated the International Association of Machinists as the exclusive bargaining agency of all the employees at the plant. The purpose of the picketing was to force the employer to deal with the picketing unions in defiance of this order, under the threat that, should he refuse to do so, his plant would be closed and his equipment prevented from being installed any place in the United States. This was coercion. Appellant was forced to close his plant. This resulted in irreparable loss to him, and his employees were thrown out of employment. He had no adequate remedy at law. The restraining order theretofore entered should have been continued."

The conclusion is inescapable, and we so hold, that the Colorado Labor Peace Act, in so far as applicable here, is in all respects constitutional, valid and enforceable, and that this is not a case "involving or growing out of a labor dispute" as defined in the act. We also hold that there is no merit to the contentions of the

defendants in error that their constitutional rights under the First, Thirteenth, and Fourteenth Amendments to the Federal Constitution will be violated, if the injunction is made permanent.

The judgment is reversed and the cause remanded with instructions to reinstate the restraining order and make the same permanent, and for further proceedings with respect to damages and otherwise as may be necessary, such proceedings to be in harmony with the views herein expressed.

MR. JUSTICE STONE and MR. JUSTICE HILLIARD concur in part and dissent in part.

MR. JUSTICE JACKSON concurs in the conclusion.

\* \* \*

MR. JUSTICE STONE concurring in part and dissenting in part.

Temporary injunction in this case was issued on the basis of the allegations of the complaint. Permanent injunction must be justified by the evidence.

Counsel for plaintiffs in their brief urge reversal on the ground of assertedly tortious acts concerning which evidence was adduced at the trial. The acts upon which plaintiffs rely are set out in their brief and may be summarized as follows:

First. Threats to injure and destroy the business of plaintiffs unless they should sign union contracts. The only threats testified to were vague and general, such as the alleged statement to the owner of a truck line that "we will get you by hook or crook," and to Beach, that if he would not join the union, "the union will put forth every effort to destroy the Beach Milk Company as a business." Such vague and indefinite threats, even in the absence of denial, were not sufficiently specific and definite to constitute a background of violence in con-

nection with other acts or to serve as basis of claim for damages or injunction.

Second. Display of force against the truck drivers of nonunion carriers and dogging them on their routes. The only evidence in the record as to this charge is that on one occasion, some twelve days before this action was begun, several union representatives congregated in cars across from the headquarters of a trucking concern and that one or more of them in a car followed each of the truckers as he went over his route picking up cream and carrying it to its destination in the city of Denver. As the trial court found, this "instilled fear into the heart of the driver." Defendants say this action was taken for the purpose of investigating the sources from which the nonunion truckers obtained their milk and the destination to which it was delivered. There was no actual interference, no word of threat, no prevention of any trucker from carrying out his duties, and no attempt or threat of repetition of the act. No ground for damages or injunction can be based thereon.

Third. Prevention of non-union carriers from delivering milk to union dairies by means of directions given employees, by picketing union dairies and by threatening strike. The evidence as to this charge discloses that for the purpose of accomplishing the objective of the union to organize the entire milk trucking industry in Denver, representatives of the union were stationed about certain union milk processing plants and that when a driver approached such plant he was asked if he had a union card; if not, he was quietly asked to join the union. Upon his refusal he was told he could not unload at that plant and, when he approached the dock, the union employees there refused to handle the milk. On one occasion a picket was posted at a union plant, but upon protest by the manager, he was told it was a mistake and the picket was withdrawn. This act may be considered together with a fourth act charged by plaintiffs: that the defendants threw a picket line around the

plant of the Beach Milk Company with the customary "unfair" legend and with the usual result of preventing delivery of milk by union drivers and interfering with the delivery of supplies and materials and helping induce union bricklayers engaged in urgent construction work at the plant to cease work. The evidence discloses that after soliciting Beach to sign an all-union contract without success, the defendants threw a picket line about the Beach plant consisting of one picket carrying an "unfair" sign. The first day there were four or five other union members standing across the street. Thereafter there was seldom any union member present except the picket. There was no violence, nor threat of violence. There was occasional soliciting of an employee to join the union, but no interference or persistence in so doing. Did such acts, third and fourth, constitute unfair labor practice under the terms of the Colorado Labor Peace Act, and if so, were they sufficient basis for damages and injunction?

In answering this question we are not dealing with novel translation of economic theory, but with rules of constitutional right which, even if apparently not following earlier trends of interpretation, have been repeatedly declared by this court and the Supreme Court of the United States. At the time of the passage of the Labor Peace Act this court in *People v. Harris,* 104 Colo. 386, 91 P. (2d) 989, *Denver Union v. Truck Lines,* 106 Colo. 25, 101 P. (2d) 486, and *Denver Union v. Buckingham Co.,* 108 Colo. 419, 118 P. (2d) 1088, and the United States Supreme Court in *Thornhill v. Alabama,* 310 U.S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093, and *American Federation of Labor v. Swing,* 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855, had declared that peaceful picketing is a form of free speech, and, as such, protected by constitutional guaranty.

Perhaps because of actual familiarity with those decisions, the legislature specifically declared in the Labor Peace Act (S.L. '43, c. 131), that, "The right of both

employer and employee freely to express, declare and publish their respective views and proposals concerning any labor relationship shall not be abrogated or limited by this act, nor shall the exercise of such right constitute an unfair labor practice," section 7 (2), and further declared in section 24, "nor shall anything in this act be so construed as unlawfully to invade the right to freedom dom of speech." The provision in section 6 (e) declaring that to cooperate in engaging in or inducing picketing is an unfair labor practice must, then, be construed in harmony with sections 7 (2) and 24 as to the right of free speech, if possible, and so construed, the word "picketing" as employed in the act must be held as intended in its coercive, and not in its persuasive, sense. Otherwise the limitation on picketing constitutes a limitation on the right to express views concerning labor relationships and invades the right to freedom of speech, contrary to the explicit provisions of the statute.

That such is the proper interpretation is borne out by the fact that our Labor Peace Act was patterned on, and followed closely, the Wisconsin Labor Peace Act. Our provision as to picketing is copied verbatim from the Wisconsin act. The Supreme Court of Wisconsin in *Hotel Employees Local v. Board,* 236 Wis. 329, 294 N.W. 632, affirmed a judgment restraining picketing as an unfair labor practice. The case was taken to the United States Supreme Court on the ground that it enjoined peaceful picketing and consequently freedom of speech. That court, speaking through Frankfurter, J., said: "Precisely what restraints Wisconsin has imposed upon the petitioners is for the Wisconsin Supreme Court to determine. * * * And that court has unambiguously rejected the construction upon which the claim of the petitioners rests.

"That the order forbids only violence, and that it permits peaceful picketing by these petitioners, is made abundantly clear by the expressions of the court: 'The act does not limit the right of an employee to speak

freely. \* \* \* The term "picketing" as used in (the act), does not include acts held in the *Thornhill case, supra,* to be within the protection of the constitutional guaranty of the right of free speech. The express language of the act forbids such a construction. It clearly refers to that kind of picketing which the *Thornhill Case* says the state has the power to deal with "as a part of its power to preserve the peace, and protect the privacy, the lives and the property of its residents." ' \* \* \* In this case it is undisputed that numerous assaults were committed by the pickets, that the pickets acted in concert; that the fines of these pickets were paid by the union; that ingress and egress to and from the premises of the employer were prevented by force and arms. It was at conduct of that kind that the statute was aimed. It is conduct of that kind that is dealt with in this case. It is conduct of that kind that it declared to be an unfair labor practice by the statute and from which the defendants are ordered to cease and desist." *Hotel & Restaurant Employee's Local v. Board,* 315 U.S. 437, 62 Sup. Ct. 706, 86 L. Ed. 946. See, annotation, 149 A. L. R., at page 469.

So construing our Labor Peace Act, there is no actional claim, nor ground for injunction resulting either from the so-called picketing at the union creameries or from the picketing at the Beach plant. Neither was a violation of the Act.

Whether injunction would lie if peaceful picketing were specifically forbidden by the act we are not now called upon to determine, but, note the statement of Jackson, J., in the opinion of the court in *Bakery, etc., Drivers Local v. Wohl,* 315 U. S. 769 (62 Sup. Ct. 816, 86 L. Ed. 1178) at page 774: "So far as we can ascertain from the opinions delivered by the state courts in this case, those courts were concerned only with the question whether there was involved a labor dispute within the meaning of the New York statutes, and assumed that the legality of the injunction followed from a determina-

tion that such a dispute was not involved. Of course that does not follow: one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive." As to the peaceful picketing there considered, the court said: "We ourselves can perceive no substantive evil of such magnitude as to mark a limit to the right of free speech which the petitioners sought to exercise. The record in this case does not contain the slightest suggestion of embarrassment in the task of governance; there are no findings and no circumstances from which we can draw the inference that the publication was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive; and it is not indicated that there was an actual or threatened abuse of the right to free speech through the use óf excessive picketing. A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual. But so far as we can tell, respondents' mobility and their insulation from the public as middlemen made it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was sustaining the peddler system except by the means here employed and contemplated; and those means are such as to have slight, if any, repercussions upon the interests of strangers to the issue."

As a fifth act, plaintiffs charge that the defendant caused union bricklayers who were engaged in necessary construction work at the Beach Dairy to cease work to the damage of plaintiff Beach. There is no suggestion, either in the brief or the evidence, that the work stoppage was caused by any act other than the picketing of the Beach plant hereinabove discussed, and the consequent refusal of the union bricklayers to cross the picket line. Such charge is not a separate act, but only one of the results of the act of picketing hereinabove discussed.

As a sixth and last tortious act plaintiff charges that the defendants called upon the managers of the Piggly-Wiggly stores, some twenty-five in number, in and near the city of Denver and threatened to picket those stores unless they immediately ceased to sell milk of the Beach dairy. This charge is sustained by the evidence. As said by the trial court in its findings: "In carrying out the threat of a secondary boycott made by the union representatives to the Beach Milk Company, various union officials * * * contacted Mr. E. H. Lambotte, President of the Piggly-Wiggly Stores Company * * *. Some nine owners or managers of Piggly-Wiggly stores were also contacted. * * * Mr. Lambotte was advised * * * that if Beach refused it might be necessary to establish a secondary boycott of the Piggly-Wiggly stores. * * * Coffey advised Lambotte that the union was going to picket the Piggly-Wiggly stores." Thus the trial court found that a secondary boycott was threatened. The purpose of the union in its dispute with Beach was to organize the milk processing industry of Denver. The Piggly-Wiggly stores, while together constituting one of Beach's best customers, were not in any way engaged in the business of processing milk. They were engaged in the retail grocery business. Their sale of milk was a very minor part of such business. Picketing these grocery stores, as an indirect means of exerting economic pressure in a dispute involving only the milk processing industry, was a plain violation of the Labor Peace Act; it would have caused violent "repercussions upon the interests of strangers to the issue," and it so far extends the orbit of industrial dispute and so "conscripts neutrals" as to be, I believe, within the authority of regulation by the state legislature as indicated by the decisions of the federal courts. As said in *Carpenters & Joiners Union v. Ritter's Cafe*, 315 U.S. 722 (62 Sup. Ct. 807, 86 L. Ed. 1143), "Recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that

directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing— anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause (in the Fourteenth Amendment) would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose."

Accordingly, in my opinion the injunction against threatened boycott by picketing the Piggly-Wiggly stores as unfair should be made permanent, and the cases should be remanded for the determination of the question of damages, if any, suffered as a result of threat of such picketing, and that as to the other issues the action should be dismissed.

Mr. Justice Hilliard concurs in this opinion.