**BOULDER VALLEY SCHOOL DISTRICT RE–2, Board of Education of the Boulder Valley School District RE–2, Julie Phillips, in her official capacity as President of the Board of Education of the Boulder Valley School District RE–2 and in her individual capacity, and Judy Lawson, in her individual capacity, Plaintiffs–Appellants,**

v.

**COLORADO STATE BOARD OF EDUCATION, State Charter School Institute Board, and State of Colorado, Defendants–Appellees.**

No. 07CA1599.

Colorado Court of Appeals, Div. V.

Feb. 19, 2009.

Caplan and Earnest, LLC, W. Stuart Stuller, Kristin C. Edgar, Boulder, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, John R. Sleeman, Jr., Deputy Attorney General, Antony B. Dyl, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees.

Kutz & Bethke, LLC, William P. Bethke, Lakewood, Colorado, for Amicus Curiae Pinnacle Charter School.

Opinion by Judge RICHMAN.

Boulder Valley School District RE–2 (the school district), the Board of Education of the Boulder Valley School District RE–2, Julie Phillips, and Judy Lawson (collectively, Boulder Valley) appeal the district court's entry of summary judgment against them on their claims against the Colorado State Board of Education (the State Board), the State Charter School Institute Board (the Institute), and the State of Colorado (collectively, the State), challenging the constitutionality of Part 5 of the Charter Schools Act, §§ 22–30.5–501 to –516, C.R.S.2008 (Part 5).

Boulder Valley contends that the district court erred in not finding Part 5 unconstitutional under article IX, sections 1, 2, or 15, or article V, section 35 of the Colorado Constitution. The State counters that the school district and the individual plaintiffs lack standing to bring these claims. We conclude that at least some of the plaintiffs have standing to raise the constitutional challenges and that Part 5 is constitutional. We affirm the judgment of the district court.

I. Statutory Provisions at Issue

In 1993, the General Assembly authorized the establishment of charter schools in Colorado. §§ 22–30.5–101 to –115, C.R.S.2008 (Part 1 of the Charter Schools Act). The Act defines a charter school as a public school created when a school district "approves its charter application and enters into a charter contract" with the school. § 22–30.5–104(2)(b). A charter school is accountable to its local school district's board of education. *Id.* The General Assembly intended to "increase learning opportunities for all pupils," "encourage diverse approaches to learning and education," "provide parents and pupils with expanded choices in the types of education opportunities that are available within the public school system," and "encourage parental and community involvement with public schools." § 22–30.5–102(2)(b)–(c), (f)-(g).

In 2004, the General Assembly amended the Charter Schools Act by adding Part 5. §§ 22–30.5–501 to –516. Responding to the growing demand for charter schools in Colorado, the General Assembly intended to:

(a) Provide an alternative mode of authorizing charter schools as a means to assist school districts in utilizing best practices for chartering schools and to approve and oversee charter schools in school districts not desiring to do so themselves; and

(b) Preserve the authority of a school district to authorize charter schools, at the school district's option.

§ 22–30.5–501(2).

Toward achieving the former, Part 5 establishes the Institute, an independent state agency authorized to approve or deny applications for *institute* charter schools. § 22–30.5–504. An institute charter school is a "public, nonsectarian, nonreligious, non-home-based school that operates pursuant to a charter contract authorized by the [Institute]." § 22–30.5–507(1)(a). An institute charter school is "administered and governed by a governing body in a manner agreed to and set forth in the charter contract," § 22–30.5–507(4), and the Institute monitors and oversees all institute charter schools, § 22–30.5–504(2). Unlike the charter schools initially created by the Charter Schools Act, an institute charter school exists "as a public school within the state, unaffiliated with a school district." § 22–30.5–507(1)(b). Local school districts may not determine the curriculum, policies, procedures, or operations of institute charter schools. *Id.* Thus, an institute charter school is accountable to the Institute with which it enters into a charter contract rather than the school district in which it is located. § 22–30.5–507(2).

Institute charter schools are open to any child who resides within the State of Colorado, not just children who reside within the school district where the institute charter school is physically located. § 22–30.5–507(3)–(4). The Colorado Department of Ed-

ucation funds institute charter schools based on the number of students in attendance, using state funding that would otherwise go to local school districts as "equalization payments" if those students were attending a public school in the local school district where the institute charter school is physically located. § 22–30.5–513(4)(a)(I). However, school districts are not required to use locally-raised funds to support institute charter schools.

Part 5 expressly provides that local school districts and the Institute have "concurrent authority to authorize charter schools and institute charter schools, respectively, to be located within the geographic boundaries of the school district." § 22–30.5–504(2)–(3). In such cases where both types of charter schools exist, the school district oversees the charter schools and the Institute oversees the institute charter schools.

However, Part 5 also requires the State Board to grant a local school district "exclusive authority to authorize charter schools within the geographic boundaries of the school district" if the State Board determines that it has provided "fair and equitable treatment to its charter schools." § 22–30.5–504(5)(a). To establish that it has provided "fair and equitable. treatment," a school district must show that it has complied with a list of factors contained in the statute. *See id.* Since satisfying the criteria of section 22–30.5–504(5)(a) depends on a recent pattern of the treatment shown by the local school board, section 22–30.5–504(6) provides that grants of exclusive authority may be made to school districts having "no discernable history of considering charter school applications or authorizing charter schools."

In addition, under the current version of Part 5, the State Board may not deny exclusive authority because the school district previously had a moratorium on charter schools, § 22–30.5–504(5)(c), and it must grant exclusive authority to local school districts where the total pupil enrollment is less than three thousand pupils, § 22–30.5–504(5)(b)(I). A grant of exclusive authority continues so long as a school district complies with the statutory criteria. § 22–30.5–504(7). Whether or not it has exclusive chartering authority, a

school district may establish institute charter schools within its geographic boundaries by submitting a resolution to the State Board. § 22–30.5–504(8).

## II. Facts and Procedural History

This appeal arises from a consolidated case brought by three school districts and various individual plaintiffs challenging the validity of Part 5. The trial court granted the State's motion for partial summary judgment as to the constitutional claims and dismissed the remaining claims with prejudice. This appeal followed.

Two of the plaintiff school districts have not appealed the rulings of the district court; only Boulder Valley's district and board and the individual plaintiffs have appealed. Although the challenge to Part 5 included constitutional and nonconstitutional theories, Boulder Valley appeals only the ruling that Part 5 does not violate provisions in the Colorado Constitution, namely, sections 1, 2, and 15 of article IX and section 35 of article V.

When this case commenced, the State Board had denied the school district's request for exclusive chartering authority. During the pendency of the case, however, the State Board granted the school district exclusive chartering authority. The State Board has upheld that grant of authority over a challenge by a disappointed charter school applicant. Litigation initiated by that applicant has since been dismissed, and to date, no institute charter schools operate within the boundaries of the school district.

## III. Mootness

█ Initially, we consider whether this appeal is mooted by the post-filing grant of exclusive chartering authority to the school district. As noted above, the grant of exclusive authority is not permanent, as the statute permits the State Board to terminate such authority should the local district fail to comply with the specified statutory criteria. § 22–30.5–504(7).

Since the grant of exclusive authority could be withdrawn, we conclude that this case involves a matter that is "capable of repeti-

tion yet evading review" and presents a question of great public importance as a facial challenge to the constitutionality of a statute, and we do not find the case to be moot. *See Humphrey v. Sw. Dev. Co.*, 734 P.2d 637, 639 (Colo.1987).

## IV. Standing

■ The State asserts that neither the school district nor the individual plaintiffs have standing in this case. We address this issue first because "[i]n order for a court to have jurisdiction over a dispute, the plaintiff must have standing to bring the case." *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004). We review standing de novo. *People in Interest of J.C.S.*, 169 P.3d 240, 243 (Colo. App.2007).

■ A plaintiff must satisfy two criteria to establish standing: First, the plaintiff must have suffered an injury-in-fact, and second, this harm must have been to a legally protected interest. *Ainscough*, 90 P.3d at 855. In Colorado state courts, unlike in the federal courts, a plaintiff need not show that his or her injury is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 437 (Colo.2000).

■ The second requirement is a prudential consideration. *Id.* For prudential reasons, a political subdivision may be precluded from challenging a state statute which directs the performance of its duties when: (1) the agency seeking judicial review is subordinate to the agency whose decision is sought to be reviewed, and (2) no statutory or constitutional provision confers a right on the subordinate agency to seek judicial review of the superior agency's decision. *Id.* at 438 (citing *Martin v. Dist. Court*, 191 Colo. 107, 550 P.2d 864 (1976)).

## A. School District

A division of this court recently addressed school district standing in *Lobato v. State*, 216 P.3d 29 (Colo.App. 2008) (*cert. granted* Sept. 15, 2008). There, fourteen school districts, along with parents of children in various Colorado school districts, challenged as-

pects of the school finance system. *Id.* at 32–33. The division held that as subordinate divisions of the state, local school districts lack standing to challenge how the General Assembly appropriates state funds to finance education. *Id.* at 34–35; *see also Denver Ass'n for Retarded Children, Inc. v. Sch. Dist. No. 1*, 188 Colo. 310, 316–17, 535 P.2d 200, 204 (1975) (applying the political subdivision rule to school districts). Moreover, the districts did not fall within the exception to the political subdivision rule where the constitution or a statute grants a political subdivision express or implied authority to file a civil action against the state. *Lobato*, 216 P.3d at 34–35, 2008 WL 194019.

■ In this case, the trial court concluded that Part 5 is not a statute directing the performance of duties by school districts. Rather, Part 5 removes from local school districts the duty of controlling instruction in institute charter schools located within their physical boundaries. The trial court also found that section 15 of article IX and section 35 of article V are self-executing; thus, they confer standing to school districts alleging that legislation infringes their powers under these provisions. As a result, it determined that the school district, and the other districts that were plaintiffs at that stage of the litigation, had standing.

We agree that this case is distinguishable from cases where school districts did not have standing. In *Denver Association for Retarded Children, Inc.*, the challenged statute directed local school districts to pay for programs benefiting the mentally retarded and seriously handicapped. 188 Colo. at 313–14, 535 P.2d at 202. In contrast, Part 5 does not direct school districts to fund institute charter schools or to take any mandatory action at all. Though Part 5 contains provisions which permit school districts to apply for exclusive chartering authority and to authorize institute charter schools by resolution, *see* § 22–30.5–504(4) & (8), the statute does not affirmatively direct school districts in the performance of their duties.

Furthermore, even if Part 5 directed school districts in the performance of their duties, they have an implied right to chal-

lenge perceived attempts to usurp local control of instruction. In *Lobato*, the exception based on express or implied authority did not apply because nothing in the state constitution grants school districts a legally protected interest in state funding for schools. 2008 WL 194019 at *4. Here, by contrast, the school district's alleged interest is in local control as an end in itself, not state funding as a means to that end. The trial court reasoned that the constitutional guarantee of local control of instruction would effectively be read out of the constitution if neither a school district nor the citizens within that district had standing to enforce it. We agree with this rationale.

Nor is *Romer v. Board of County Commissioners*, 956 P.2d 566, 573 (Colo.1998), applicable on these facts. In *Romer*, the court determined, for prudential reasons, that a subordinate agency needs an "express legislative grant" to seek review of the action of a superior agency. *Id.* at 574. There, a county sued the State Department of Human Services based on provisions of Colorado's public assistance laws. *Id.* at 568–69. In this case, however, the school district is seeking to enforce rights protected by the state constitution; it is not challenging a specific action of a superior agency. Though the Institute and the State Board are named as defendants, the essence of Boulder Valley's claim is that Part 5 is unconstitutional. Under these circumstances, where a constitutional provision confers a right of local control of instruction on school districts, the prudential considerations which weighed against finding standing in *Romer* do not apply. Consequently, we hold that the school district has standing to bring this case.

## B. Individuals

■ The trial court determined that the individuals in this case have standing as well. Colorado case law provides broad taxpayer standing. *Ainscough*, 90 P.3d at 856. A generalized injury-in-fact is sufficient in a taxpayer suit. *Id.* "[E]ven where no direct economic harm is implicated, a citizen has standing to pursue his or her interest in ensuring that governmental units conform to

the state constitution." *Barber v. Ritter*, 196 P.3d 238, 246 (Colo.2008) (quoting *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo.1995)).

■ The individual plaintiffs in this case allege that they are citizens of Colorado as well as residents and registered electors of the school district. The State contends these allegations are insufficient because any alleged injury is wholly speculative given that no institute charter schools operate in the school district and that it has exclusive chartering authority.

Nonetheless, as our precedent makes clear, an interest in seeing that governmental entities function within the bounds of the state constitution is sufficient to confer standing. When a plaintiff-taxpayer alleges that a government action violates a specific constitutional provision, such an averment satisfies the two-step standing analysis described above. *See Barber*, 196 P.3d at 247.

■ The State also contends that the individual plaintiffs do not have standing because they failed to allege expressly that they are taxpayers. Taxpayer status has been a stated basis for conferring standing in our cases. *See, e.g., Conrad v. City and County of Denver*, 656 P.2d 662, 666 (Colo. 1982). Here, although the individual plaintiffs may be taxpayers, they did not so allege; nor did they submit evidence of their taxpayer status by way of affidavit or otherwise during the course of the proceedings below, despite having had the opportunity to do so. Accordingly, we cannot conclude that the individuals have established their standing to bring this case. This does not, however, diminish the appeal, as the school district has standing to challenge Part 5's constitutionality.

## V. Standard of Review

■ We review de novo the constitutionality of a statute. *E–470 Pub. Highway Auth. v. Revenig*, 91 P.3d 1038, 1041 (Colo. 2004). The General Assembly has plenary power to legislate subject only to the limitations of the state and federal constitutions. *Denver Milk Producers v. Int'l Bhd. of*

*Teamsters Union,* 116 Colo. 389, 414, 183 P.2d 529, 541 (1947).

This case raises the question whether the interplay among three education provisions contained within article IX of the Colorado Constitution, as well as the right to local self-government protected by article V, limits the power of the General Assembly to create institute charter schools. Given the plenary power of the legislature, we must presume that Part 5 is constitutional and uphold it unless Boulder Valley proves beyond a reasonable doubt that it is unconstitutional. *See Bd. of Educ. v. Booth,* 984 P.2d 639, 650 (Colo.1999).

Furthermore, to the extent this case involves an issue of what is the best public policy which can be adopted to attain quality schooling and equal educational opportunity for all children who attend Colorado public schools, we are reluctant to intrude in considerations which properly lie within the legislative domain. *See Lujan v. Colo. State Bd. of Educ.,* 649 P.2d 1005, 1018 (Colo.1982).

VI.   Analysis of Article IX Provisions

Article IX, section 1 vests general supervisory power over public schools in the State Board, providing as follows: "The *general supervision* of the public schools of the state shall be vested in a board of education whose powers and duties shall be as now or hereafter prescribed by law." Colo. Const. art. IX, § 1 (emphasis added).

Article IX, section 2 mandates a thorough and uniform public school system, providing:

The general assembly shall, as soon as practicable, provide for the establishment and maintenance of *a thorough and uniform system* of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously.

Colo. Const. art. IX, § 2 (emphasis added).

Article IX, section 15, the "local control" provision, provides for the creation of local school districts:

The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors to be elected by the qualified electors *of the district.* Said directors shall have *control of instruction* in the public schools *of their respective districts.*

Colo. Const. art. IX, § 15 (emphasis added).

Essentially, Boulder Valley asserts that these provisions impose limitations on the legislature and render Part 5 unconstitutional because it (1) impermissibly grants the State Board authority, beyond its general supervisory authority, in violation of section 1, (2) constitutes an invalid exercise of legislative power in violation of section 2, and (3) thereby infringes on the local control power granted to the school district under section 15.

In *Booth,* 984 P.2d at 643, the Denver Board of Education raised arguments similar to those raised here in challenging the constitutionality of the "second appeal" provision of the Charter Schools Act. The "second appeal" provision grants power to the State Board to consider whether a local school district's decision to deny a charter school application is "contrary to the bests interests of the pupils, school district, or community," and, if it so finds, to remand the decision with instructions to approve the charter application. § 22–30.5–108(3)(a). The Denver Board argued that the "second appeal" provision exceeded the general supervisory authority granted to the State Board under section 1, infringed on the local control of the school district in violation of section 15, and was therefore unconstitutional to the extent it permitted the State Board to order the school district to approve a charter school.

The supreme court answered the argument at the outset of its opinion:

The question is whether the General Assembly constitutionally may authorize the State Board of Education to *order a local school board to approve a charter school application* that the local board has rejected when the State Board finds approval to be in the best interests of the pupils, school district, or community. *We hold that the second-appeal provision is constitutional.*

984 P.2d at 942 (emphasis added). Thus *Booth* expressly held that the State Board can "order" a local school board to approve an application for a charter school, which the local school district must fund at a rate of at least eighty percent of the district's per pupil expenditures and allow to occupy any available facility in the district without paying rent. *Id.* at 653 (citing § 22–30.5–112).

In reaching this result, the *Booth* court determined that the constitution requires balancing the local district's interest in exercising control over instruction with the State Board's interest in asserting its general supervisory authority. It is a balance that first must be struck by the legislature and, if challenged, reviewed by the courts. *Booth*, 984 P.2d at 646. As a guiding principle in resolving this controversy, the court held:

> [W]here the General Assembly has allocated authority between the State Board and local boards in order to further a legitimate educational purpose, we will give deference to the balance that it sought to maintain between the two entities. That is, we will presume the allocation is valid unless it clearly impedes the capacity of either the State Board or a local board to exercise its independent constitutional authority.

*Id.* at 650.

In upholding the "second appeal" provision, the court concluded that such State Board action was consistent with the constitutional grant of general supervisory authority to the State Board, *id.* at 647–48, and that the State Board's order substituting its judgment for that of the local board did not unconstitutionally "usurp" the authority of the local school district's control. *Id.* at 651.

Although the holding in *Booth* is not determinative of the precise constitutional issue raised here, it provides a framework for resolving the arguments advanced by Boulder Valley. First, we must give deference to the balance the legislature sought to maintain between the State Board and Institute on the one hand, and the local school districts on the other, to further the legitimate educational purpose of establishing institute charter schools. Second, unless the allocation of authority by the legislature clearly impedes the capacity of the local school district to exercise its authority or clearly exceeds the authority of the State Board, we must presume the allocation is valid. Third, the local board has the burden of persuading us that the statute is unconstitutional beyond a reasonable doubt. *Id.* at 650.

## A. Balance of Competing Interests

■ We conclude that Part 5, a statutory scheme wherein the State Board does not order a local board to do or finance anything, is less of an intrusion on a local board's "control" over education than the "second appeal" provision at issue in *Booth*. We also conclude that the legislature crafted Part 5 in a manner that carefully maintains the balance of authority between the State and the local school districts.

Part 5 does not grant the State Board the power to order local school districts to take action; it does not require them to affirmatively approve, open, or manage institute charter schools. Part 5 does not require the local school districts to accept or approve an institute charter school application; nor does it usurp the districts' decision-making ability to implement the educational programs for which they are ultimately responsible, a potential constitutional infirmity. *See Booth*, 984 P.2d at 653.

In *Booth*, the order directing approval of the charter school application implicitly required the local school district to provide a minimum level funding for such a school, although the exact amount was to be negotiated. *Id.* at 653. The *Booth* court did not find such a situation to be an infringement of the local control provision. Further, in *Booth*, the order directing approval of the charter school implicitly required the local school district to provide space in any available school district facility without charge for rent, although the terms of lease were subject to negotiation. *Id.* The *Booth* court did not find this requirement to be an unconstitutional infringement of local control.

Part 5, in contrast, does not require a local school district to establish, fund, or provide space for an institute charter school. Part 5 authorizes an institute charter school to ne-

gotiate and contract with a local school district for the use, operation, and maintenance of school buildings and grounds, but it does not require local school districts to provide buildings, grounds, or services to institute charter schools.

Moreover, Part 5 contains checks and balances against the exercise of power by the State Board, primarily because (1) the Institute and the local boards have concurrent authority to establish charter schools, § 22–30.5–504(2) & (8); and (2) local boards can seek, and if specified prerequisites are met, the State Board must grant, exclusive authority to charter schools in their districts. § 22–30.5–504(5) & (7). If a local school district obtains exclusive chartering authority, such authority supplants the role of the State Board and the Institute. Indeed, Boulder Valley School District ultimately was granted exclusive chartering authority. As a result, the Institute and the State Board cannot establish institute charter schools in the school district.

Accordingly, we conclude the general arrangements of Part 5 as established by the General Assembly maintain the balance, articulated in *Booth*, between the competing interests of the local school districts and the State. We also find the balance of authority in Part 5 to be consistent with the specific constitutional provisions at issue here.

### B. Application of Article IX

Boulder Valley argues that Part 5 is unconstitutional because sections 1, 2, and 15 of article IX collectively prohibit the General Assembly from establishing schools that are not part of the local school district system. We disagree.

### 1. Sections 1 and 2

■ Boulder Valley argues that Part 5 is incompatible with the general supervision powers committed to the State Board by sections 1 and 2 of article IX. As the *Booth* court noted, the general supervisory power granted to the State Board by section 1 includes the vesting of power in the State Board to "provide direction, inspection, and critical evaluation of 'the whole' in the sense of contributing a statewide perspective to

decisions affecting public schools." 984 P.2d at 647. The opinion states that this power emanated from the responsibilities given to the Territorial Superintendent of Public Instruction, which included making known "existing defects" in the school system and disseminating to the public "desirable improvements in the government and instruction of schools." *Id.*

Part 5 comes within these general supervisory powers of the State Board, as described in *Booth*. Part 5 provides a "statewide perspective," for it is premised on a legislative evaluation that in the school system as a whole "[t]here is a growing demand for more charter schools in the state [and] ... an underserved population of at-risk students in the state, for whom innovative educational models are needed." § 22–30.5–501(1)(a)–(b). The purpose of Part 5 is to "[p]rovide an alternative mode of authorizing charter schools as a means to assist school districts in utilizing best practices for chartering schools and to approve and oversee charter schools in school districts not desiring to do so themselves [and to] [p]reserve the authority of a school district to authorize charter schools, at the school district's option." § 22–30.5–501(2)(a)–(b).

Read more liberally, this legislative declaration states that the school districts as a whole are not doing an adequate job of providing charter schools within their districts. Thus, Part 5 addresses perceived defects in the school system on a statewide basis. It provides for improvements by setting uniform standards for how school districts must treat charter school applicants to maintain their exclusive chartering authority. It also provides an alternate route to create charter schools in districts that do not meet those standards. Part 5 is not directed at any particular school district or geographic area; it provides for the establishment of institute charter schools in any school district. More significantly, it opens the enrollment of any institute charter school to students who live anywhere in the state. Thus, Part 5 is intended to make the statewide education system more thorough by expanding the options available to all students in the state and more uniform by ensuring that comparable oppor-

tunities for creating charter schools exist across the state.

Boulder Valley argues that the "general supervision" provision expresses Colorado's traditional "distrust of centralized authority in the management of local affairs," and Part 5 conflicts with this principle because it denies citizens of the school district democratic accountability. Boulder Valley undermines its own argument, however, with its observation that the election process also ensures statewide representation on the State Board. Thus, even if democratic accountability is a purpose of section 1, Part 5 does not undermine such a purpose. *See Booth,* 984 P.2d at 647 (noting that the expectation that the State Board contributes "a statewide perspective to decisions affecting public schools" is reflected in an election process that ensures statewide representation on the board). Ultimately, we find this reasoning unpersuasive, as state-level officials, just as local school board members, are subject to electoral control.

Article IX, section 2 provides that the legislature shall provide for the establishment and maintenance of "a thorough and uniform system" of free public schools throughout the state. Boulder Valley asserts that the plain meaning of "a thorough and uniform system" is that the General Assembly must establish a "single uniform system of public schools consisting of school districts ... governed by locally elected officials," and therefore it is prohibited from establishing a "second and different system" governed by persons who sit beyond the reach of the communities affected by their decisions. We find no language in this provision that engrafts these criteria onto the phrase "thorough and uniform system." Boulder Valley cites no case interpreting the provision in this manner. Nor does it cite any authority which has invalidated any statute for violating the "thorough and uniform" provision of section 2.

In interpreting the power of the State Board, *Booth* notes that the General Assembly has "almost unlimited power to abolish, divide or alter school districts," and "[t]his power might be dispositive with respect to the validity of legislation providing for creation of independent charter schools districts. *See* §§ 22–30.5–201 to –209." 984 P.2d at 646 n. 3. Though the statutes cited in the footnote were repealed after the pilot program expired, the footnote suggests, without explicitly holding, that the legislature has unlimited power to "alter" the school district by creating independent charter school districts which operate parallel to the local school districts. If such authority exists under article IX, section 1, such authority must extend to the creation of institute charter schools that operate parallel to the local public schools.

In *Lujan,* 649 P.2d at 1025, the court held that the "thorough and uniform" provision is satisfied if "thorough and uniform educational opportunities are available through state action in each school district," and therefore it does not require educational expenditures per pupil in every local school district to be identical. Just as local school districts have an opportunity to provide additional educational options without contravening the requirements of section 2, *see id.,* we hold that the State may provide additional educational opportunities open to all students in the state through institute charter schools, provided that these opportunities are available statewide.

We see no reason why the language of section 2 should be read to prohibit the State from creating a school system with different types of schools, some controlled by school districts while others are not. Indeed, the State has already done so by creating the Colorado School for the Deaf and the Blind, which is a state-funded and -controlled public school, not under the control or authority of any school district. *See* § 22–80–102(1), C.R.S.2008.

Additionally, we see no reason to contradict the General Assembly's clear intent as expressed in section 22–30.5–503(6): "The institute and institute charter schools shall be deemed part of the thorough and uniform system of free public schools to be established and maintained by the general assembly, as required by section 2 of article IX of the state constitution." Thus, section 2 does not prohibit the State from establishing institute charter schools that are not controlled

by school districts, and such schools may constitute part of the thorough and uniform system of education required by section 2.

## 2. Section 15

Boulder Valley argues that the phrase, "control of instruction in the public schools of their respective districts," as used in section 15, means that local school districts have control over all public schools physically located within their geographic boundaries. Boulder Valley cites no precedent directly supporting its territorial interpretation of section 15, and we do not find this interpretation necessarily correct.

In interpreting the scope of section 15, *Booth* notes that while a local school district's authority is not absolute, nevertheless, any "general statutory or judicial constraints, if they exist, must not have the effect of usurping the local board's decision-making authority or its ability to implement, guide, or manage the educational programs for which it is ultimately responsible." 984 P.2d at 649.

▮▮ Part 5 does not "usurp" the local board's power to implement, guide, or manage educational programs in the local public schools. First, under Part 5 the local boards have the opportunity to take back the exclusive authority to establish institute charter schools in their districts. Second, if they elect not to assert that authority, then the educational programs established in the institute charter schools set up by the State Board are not programs for which they are "ultimately responsible." Further, as summarized in *Booth*, "control of instruction requires substantial discretion regarding the character of instruction that students will receive at the district's expense." 984 P.2d at 648. In the case of institute charter schools, the instruction is not at the local district's expense.

In evaluating whether a local board's authority had been usurped, *Booth* expressly upholds the authority of the State Board to make the final determination whether the charter school application is in the "best interests of the pupils, school district or community." 984 P.2d at 651. As characterized by *Booth*, "the State Board is authorized to

substitute its judgment for that of a local board." *Id. Booth* concluded that the exercise of such power does not "usurp" the authority of the local board.

Moreover, the "usurpation" argument ignores that enrolling in an institute charter school, like in other charter schools, is a voluntary act. To the extent that an institute charter school is able to operate against the wishes of the local board, we expect that it offers educational alternatives in a locality that the local board is not providing. If there is no local demand for those alternatives, it is unlikely the school would survive.

The dissent correctly points out that *Booth* found the "second appeal" provision avoided "constitutional infirmity" because it held that when the State Board orders a local board to approve a charter application, it is "not requiring the local board to open a school," but rather requires the local board to "resolve any issues necessary to permit the applicants to open a charter school." *Id.* at 654.

However, in framing the issue that leads to the comment about avoiding constitutional infirmity, *Booth* first states that the question is whether the State Board "order to approve an application, substituting its judgment for that of the local board, would authorize a proposed charter school to operate under the terms of an application that the local board had rejected." 984 P.2d at 653. If so, the proposed charter school would be able to operate in the building it selected (a vacant Denver Public School building), use the operating terms in the contract, and yet force the local board to administer a charter school with which it did not contract. The *Booth* court was concerned that formation of a forced, unilateral contract would create a direct conflict with the "local board's statutory authority 'to determine which schools of the district shall be operated and maintained.'" *Id.* (quoting § 22–32–110(1)(l)). This is the concern that would raise "serious constitutional infirmities." *Id.*

But, unlike the situation which concerned the *Booth* court, an institute charter school does not create a forced unilateral contract with a local school district. Nothing in Part 5 forces anything upon local school districts.

Thus, Part 5 does not raise the constitutional infirmity referenced in *Booth*.

■ Boulder Valley also contends that Part 5 is inconsistent with the so-called local control provisions of section 15 of article IX, relying on the established rule that school districts have the right to control locally-raised funds and instruction within their schools. *See, e.g., Belier v. Wilson*, 59 Colo. 96, 98, 147 P. 355, 356 (1915) (state could not require that taxes raised in one school district be used to fund a public high school in another district); *Sch. Dist. No. 16 v. Union High Sch. No. 1*, 60 Colo. 292, 152 P. 1149 (1915) (same); *Hotchkiss v. Montrose County High Sch. Dist.*, 85 Colo. 67, 273 P. 652 (1928) (statute permitting a student to attend a public school in a neighboring district and compelling her home district to pay for it invalid). More recently, in *Owens v. Colorado Congress of Parents, Teachers & Students*, 92 P.3d 933, 940, 943 (Colo.2004), the Colorado Supreme Court reaffirmed the *Belier* line of cases when it struck down, as violating section 15, a voucher program which would have required school districts to pay locally-raised funds to parents who in turn would have paid those funds to nonpublic schools.

The dissent correctly points out that *Owens* struck the voucher program in part because it found that the program "deprives the [local] school districts of all local control of instruction" and therefore provided for no balancing of constitutional powers as required under *Booth*. 92 P.3d at 942. However, we read this statement in the context of the issue presented in that case, with due consideration of the language preceding this comment. *Owens* emphasizes that under the voucher program, the local boards did not retain any authority to determine which schools received the voucher funds, the amount of the district funds to be devoted to the voucher program, or the character of the instruction paid for by those funds. *Id.* That is, the holding was based on the use of *locally-raised funds* in programs outside the control of the district. As noted above, Part 5 does not entail the use of any local district funds.

■ Under existing case law, the State may apportion the state-controlled Public School Fund in any manner that is not unreasonable, discriminatory, or in contravention of the constitution. *Craig v. People in Interest of Hazzard*, 89 Colo. 139, 148, 299 P. 1064, 1067 (1931). In *Craig*, the Colorado Supreme Court upheld a statute which required the State Superintendent of Public Instruction to adjust the apportionment of state education funds when a student attends a public school in a county other than that where he or she resides. *See id.* at 144–45, 299 P. at 1065–66.

However, previous cases dealing with article IX have not expressly addressed the issue of whether the state has the power to open a school in a public school district, using only state money, without the school district's consent or participation. In this respect, we are presented with an issue of first impression.

Boulder Valley argues that the trial court relied too heavily on the fact that institute charter schools are not funded by locally-raised funds. The trial court acknowledged the supreme court's statement in *Owens*, that "[t]his Court has long recognized, however, that the constitutional division of power between the state and local boards is not measured by funding." 92 P.3d at 943. *Owens* also states that "the amount of funding derived from local tax revenues as compared to state contributions is immaterial to our analysis of the level of discretion the Colorado Constitution confers on local school boards today." *Id.* Boulder Valley argues that when the trial court concluded that Part 5 is not an unconstitutional intrusion by the state into the prerogative of local boards "primarily for the reasons that no locally-raised money is implicated," it ignored the holding of *Owens*.

We agree that the funding source for the institute charter schools is not the sole determinative factor as to whether local control is unconstitutionally infringed. But it is a factor that may be weighed. In *Owens*, as in *Craig*, the court analyzed a funding scheme implicating both locally-raised and state-controlled revenues. *Id. Owens* did not disturb or limit the court's previous holding in *Craig* that "the state's power over its own funds was plenary in nature and did not depend in

any way on the overall structure of school finance." *Id.* (citing *Craig,* 89 Colo. at 148, 299 P. at 1067). In fact, the *Owens* court cited *Craig* with approval for the proposition that inter-district funding could be accomplished without running afoul of section 15 "only by drawing funds exclusively from the state-controlled public school income fund." 92 P.3d at 940.

Here, the institute charter schools are funded exclusively from state-controlled funds. The trial court did not rely exclusively on the source of funding to find Part 5 constitutional. We reject Boulder Valley's argument that error may be premised on the one sentence from the trial court's decision that could be read to suggest otherwise.

We conclude that Boulder Valley has failed to show beyond a reasonable doubt that the creation of institute charter schools exceeds the State Board's general supervisory powers under article IX, sections 1 and 2 or infringes on its right of local control under article IX, section 15.

We view the recent Florida case, *Duval County School Board v. State Board of Education,* 998 So.2d 641 (Fla.App. 1 Dist.2008), cited in the dissent, as inapplicable to the issues before us. The language of the Florida constitutional provision granting authority to the local school boards is broader than that of article IX, section 15 of the Colorado Constitution, as it gives the boards power to "operate, control and supervise all free public schools within the school district," not just "control of instruction." Fla. Const. art. IX, § 4(b). The Florida constitutional provision granting power to its state board of education does not include the general supervisory power granted to Colorado's State Board under article IX, section 1 of the Colorado Constitution. Thus, the *Duval* court was not called upon to engage in the balancing of the respective constitutional powers as required under the Colorado case law discussed above. Accordingly, we do not consider its conclusion helpful in this case.

VII. Analysis of Article V, Section 35

Boulder Valley contends that creation of the Institute pursuant to Part 5 violates the historic right to local self-government pro-tected by article V, section 35 of the Colorado Constitution. Section 35 provides in its entirety:

> The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.

Colo. Const. art. V, § 35.

Boulder Valley argues that the decision to operate a public school is a "municipal function" that the General Assembly may not delegate to the Institute. We disagree.

In *Regional Transportation District v. Colorado Department of Labor & Employment,* 830 P.2d 942, 946 (Colo.1992) (*RTD* ), the Colorado Supreme Court set out its two-pronged, "functional" approach to determining whether a unit of government is a municipality within the meaning of section 35. First, a court determines whether the function in question is "truly local in the sense that, principally if not exclusively, it affects only those persons residing within the boundaries of the governmental unit in question." *Id.* Second, it decides "whether the political processes make those who perform the function responsive to the electorate within the affected area." *Id.* Boulder Valley has not satisfied either element.

Colorado courts have held that counties engaged in providing services entirely within their own boundaries, such as utility and transportation services, perform municipal functions when the affected citizens are fully able to remedy perceived problems with the service through the regular election process or exercise of the right of recall. *See id.; see also City of Durango v. Durango Transp., Inc.,* 807 P.2d 1152, 1157–58 (Colo. 1991) (county providing mass transit entirely within county boundaries performs a municipal function); *Town of Holyoke v. Smith,* 75 Colo. 286, 297–98, 226 P. 158, 162 (1924) (municipally owned utility providing electric service within municipality performs a municipal function). In *RTD,* however, the court concluded that the Regional

Transportation District was not performing a municipal function by providing transportation services in "the Denver–Metropolitan area" because such services implicate economic and social issues of concern to the entire state and importantly affect citizens of the state outside the entity's boundaries. *RTD*, 830 P.2d at 946–47.

■ We now apply these principles to the Institute established by Part 5. As to the first prong of the inquiry, Boulder Valley's position is contrary to the express holding of *Wilmore v. Annear*, 100 Colo. 106, 115, 65 P.2d 1433, 1437 (1937), that "the establishment and financial maintenance of the public schools of the state is the carrying out of a state and not a local or municipal purpose." Additionally, oversight of the public schools clearly affects the entire state; institute charter schools are funded by taxpayers throughout the state and are open to all students in the state. §§ 22–30.5–513 & – 507(3). Though some "uniquely local" concerns, such as traffic, parking, and the character of the neighborhood may be implicated by the decision whether to open a public school, we cannot agree with Boulder Valley's assertion that the functioning of the public schools primarily affects only those within the geographic boundaries of a school district.

Though we need not reach the second prong of the *RTD* analysis, we mention briefly again that the State Board and the Institute perform a function that benefits the entire state and are accountable on a statewide basis through the electoral process.

## VIII. Conclusion

We affirm the decision of the trial court granting summary judgment to the State and dismissing the claims alleging constitutional infirmities in Part 5 of the Charter School Act.

Judgment affirmed.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

Judge DAILEY concurs.

Judge CRISWELL * concurs in part and dissents in part.

Judge CRISWELL concurring in part and dissenting in part.

I agree with the majority's resolution of the standing issue. I also agree that this issue is not moot. However, I must disagree with the conclusion that the amendments to the Charter Schools Act do not infringe upon the "local control" provisions of article IX, sections 15 and 16 of the Colorado Constitution. Rather, I conclude that these amendments usurp the local school districts' authority under those constitutional provisions, and they are, therefore, facially invalid. Having reached this conclusion, I need not consider Boulder Valley's other constitutional claims.

As the majority seems to recognize, the basic issue presented here is whether the General Assembly may empower a state agency to create a parallel and competing system of public schools over which no local school board has any control. The statute at issue places within the authority of the Institute the determination whether a local school board may assert control over a charter school created by that agency. This is made evident by the Institute's seemingly inconsistent treatment of Boulder Valley School District.

Further, the fact that the present statute is limited to "charter" schools is relatively inconsequential. If the state can constitutionally create a competing system of state-controlled charter schools, it can, exercising the same constitutional authority, create an entirely separate public school system controlled by a state agency or by entities created and controlled by that agency.

The question, then, requires a consideration of the seeming conflict between the state's constitutional responsibility under article IX, sections 1 and 2 to provide "general supervision" of the state's public schools and a "thorough and uniform system of free public schools," on the one hand, and the local

§ 24–51–1105, C.R.S.2008.

school board's authority under article IX, sections 15 and 16 to "control ... instruction in the public schools of their respective districts" and to "prescribe textbooks to be used in the public schools" on the other.

There have been few previous instances in which the legislation in issue presented such a direct conflict. Indeed, most of the cases in which the Colorado courts have considered the reach of a local school board's constitutional authority have involved a state mandate for the school district to perform an act without providing for the direct involvement of any state agency. In these cases, the supreme court has determined that the state may not require the expenditure of local funds to provide education to students where the local board has no control over the education to be provided to those students. *See, e.g., Belier v. Wilson,* 59 Colo. 96, 147 P. 355 (1915). This principle has most recently been applied by that court in *Owens v. Colorado Congress of Parents, Teachers & Students,* 92 P.3d 933 (Colo.2004). While this line of cases required the court to consider the reach of the local board's constitutional authority over the instruction given students in its district, it did not require a corresponding inquiry into the reach of the state's constitutional authority.

The only decision that did require such a comparison, and the one that is the most instructive upon the issue presented here, is *Board of Education v. Booth,* 984 P.2d 639 (Colo.1999). That case arose under the Charter Schools Act before the amendments to that Act that are under consideration here.

The issue presented in *Booth* was the legal effect of a final order of the State Board under a former version of section 22–30.5–108(3)(d), which directed a local school board to approve a charter school application. A division of this court had held that such an order required the local school district to enter into a contract with the charter school applicants that would contain all of the provisions set forth in their application. *Booth v. Board of Education,* 950 P.2d 601 (Colo.App. 1997). In doing so, the division had refused to pass upon the constitutionality of that provision of the Act, because it considered that this issue was not fully ripe for determination.

The supreme court in its *Booth* opinion rejected both of those conclusions. First, it determined that the issue of the constitutionality of the pertinent statute, considering the record before it and the Uniform Declaratory Judgment Act, § 13–51–105, C.R.S.2008, rendered that issue ready for resolution. *Booth,* 984 P.2d at 644–45. It then proceeded to determine the legal effect of an order requiring a local school district's approval of a charter school application. In doing so, it recognized that it was required to "consider the interplay" between the pertinent statute and the constitutional provisions that granted both to the state and to the local boards authority over the public school system of this state. *Id.* at 645.

It then considered the nature of the constitutional authority granted to the state and concluded that its supervising authority was intended by the framers to include only "direction, inspection and critical evaluation of 'the whole' in the sense of contributing a statewide perspective to decisions affecting public schools." *Id.* at 647–48.

In turn, it considered the nature of a local board's authority under article IX, section 15. It ultimately concluded that, while such authority is not absolute, nevertheless, any "general statutory or judicial constraints ... must not have the effect of usurping the local board's decision-making authority or its ability to implement, guide, or manage the educational programs for which it is ultimately responsible." *Id.* at 649.

It then reviewed the statutory provision at issue in *Booth* and rejected the conclusion that the State Board's final order resulted in a contract between the applicants and the local school board. On the contrary, it concluded that if the Act were interpreted to require a local school board to approve a charter school under conditions not approved by that board, the effect of the statute might well be to usurp the local school board's authority or its ability to implement the educational programs for which it is ultimately responsible. Such a construction of the statute would "raise serious constitutional infirmities." *Id.* at 653.

Rather, it concluded that under the Act, when the State Board issues a final order requiring the local board to approve a charter school application, the order only "requires the charter applicants and the local board to resolve any issues necessary to permit the applicants to open a charter school." *Id.* at 654. Such an order only "creates a good faith commitment on the part of the local board to work with the charter applicants" to resolve any recurring concerns that it may have. *Id.* at 655. *"This understanding* of a State Board order to approve a charter application," it said, *"avoids constitutional infirmity." Id.* (emphasis supplied).

*Booth* itself, then, makes reasonably clear that the state's general authority to provide "direction, inspection, and critical evaluation" of the whole public educational system does not allow it to dictate that a local school board must establish a particular public school.

That this is the meaning to be placed upon *Booth* has been made even clearer by the supreme court's more recent decision in *Owens.* That case raised the issue whether a state statute could require a local school board to pay parents to allow their children to enroll in nonpublic schools over which the local school board had no instructional control. The question presented in *Owens,* then, was similar to the issues presented in the *Belier* line of cases. Nevertheless, the *Owens* opinion contains an analysis of *Booth* that is pertinent to the issue before us.

First, the *Owens* court emphasized that "[t]he principle of local control has deep roots in Colorado's constitutional history." 92 P.3d at 938. It noted that the original framers deliberately removed authority over education from the State Board and specifically placed authority over that subject in local school boards. *Id.* And, it concluded that the *Belier* line of cases compelled the conclusion that the requirement for the use of local funds to pay for an education not controlled by the local school board was unconstitutional.

In *Owens,* moreover, the state had contended that the decision in *Booth,* properly construed, would legitimize the statute at issue there. In rejecting this assertion, the

court noted that, as construed by *Booth,* the statutorily required final order "simply required the local board to negotiate in good faith." *Id.* at 942. It concluded:

> The charter school statute [at issue in *Booth* ] met constitutional requirements *because it closely circumscribed the state board's authority in the appeals process while simultaneously preserving the local board's control of instruction given in the charter school.*

*Id.* (emphasis supplied).

Hence, because the statute at issue in *Owens* deprived the local school board "of all local control of instruction," the statute could not pass constitutional muster. *Id.*

Here, as in *Owens,* the statute at issue deprives the local school board of all control over the instruction to be given in any institute charter school that is to be located within its boundaries. That control is to be exercised by the state through a separate entity, unless that agency unilaterally decides to grant authority over the charter school to the local school board.

This function of controlling the education of students within a public school goes beyond the state's authority to direct, inspect, and critically evaluate the whole public school system by contributing a state perspective to the decisions supporting public schools. *Cf. Booth,* 984 P.2d at 647. Rather, by authorizing the state to establish public schools over which no local school board has any authority, the statute has usurped the local school board's constitutional authority. It seems clear to me, therefore, that the statute at issue impermissibly intrudes upon the authority of the local school boards to control instruction in the public schools within their districts.

This conclusion finds support in the recent opinion by a Florida District Court of Appeal in *Duval County School Board v. State Board of Education,* 998 So.2d 641 (Fla.App. 2008). Florida's constitution contains provisions similar to those at issue here. It authorizes its local school boards to "operate, control and supervise all free public schools within the school district." Fla. Const. art. IX, § 4(b). Likewise, it authorizes the Flori-

da legislature to provide for "a uniform, efficient, safe, secure, and high quality system of free public schools." Fla. Const. art. IX, § 1(a). Relying upon the latter provision, the Florida legislature adopted an act that was, in all essential provisions, the same as Colorado's recently amended Charter Schools Act. It established a state commission that had authority to authorize charter schools throughout the state and withdrew the local school board's right to do so, except with the approval of this commission.

The Florida District Court of Appeal held that this act conflicted with the local board's constitutional authority and was facially invalid.

Moreover, the fact that, here, the charter schools to be established by the Institute are to be funded solely from a source other than the local districts is, in my view, substantially irrelevant. It is true, of course, that in the *Belier* line of cases local funds were used to pay for a student's education over which the local school board had no control. The basic constitutional sin in these cases, however, was this lack of local control over the educational program. And, of course, in none of those cases had the state attempted to create a competing public school system, as is the case here. Indeed, in *Owens,* the most recent *Belier*-type case, the supreme court specifically said that "the constitutional division of power between the state and local boards is not measured by funding." 92 P.3d at 943.

In addition to the contention that State Board's order to approve an application for a charter school violated the local control provision of section 15, the local school district in *Booth* had also argued that the order violated the provision in section 16 that prohibits the General Assembly or the State Board from prescribing textbooks "to be used in the public schools." However, because the charter school there proposed to use the same textbooks as were used in the district's schools, the court concluded that State Board's order in that case did not implicate section 16. 984 P.2d at 655. Hence, it declined to consider how that constitutional prohibition might be impacted in another case.

Here, of course, unlike the circumstance in *Booth,* the Act does not provide for the local

school board to have any involvement in the instruction to be offered or the textbooks to be used in the institute charter schools. Those decisions are to be made by managers authorized by the state agency, the Institute, created by the General Assembly. To this extent at least, those managers are agents of the General Assembly, and the textbooks selected by them are the products of that body. I conclude, therefore, that the amended Act also violates the principle incorporated in section 16.

I also must conclude that the provisions of article VIII, section 1, do not authorize a state's violation of the provisions of article IX, sections 15 and 16.

It is to be noted, first, that this provision is not to be found in article IX, which is devoted to "Education." Rather, it was placed in a separate article, entitled "State Institutions." Indeed, no reference to "public schools" is to be found in article VIII, section 1. Rather, that provision reads as follows:

> *Educational,* reformatory and penal *institutions,* and those for the benefit of the insane, blind, deaf and mute, and such other institutions as the public good may require, shall be established and supported by the state. . . .

(Emphasis supplied.)

Given these provisions, and their location, their most logical interpretation is that the term "educational . . . institutions" refers to institutions of higher learning and not to public schools offering education at the kindergarten through high school levels. And, this interpretation appears to be the one adopted by the supreme court in *Wilmore v. Annear,* 100 Colo. 106, 109, 65 P.2d 1433, 1434 (1937) ("It will be observed that section 1, article 8, of the Constitution uses the term 'educational . . . institutions' in referring to schools *other than the constitutionality required public schools*" (emphasis supplied) ).

But, even if the phase "educational institutions" could be construed to include "public schools," I note that the provision authorizes the state simply to "establish" and "support" those schools. To the extent that these terms might be construed to allow the state to control instruction within public schools,

this provision would seem to conflict with the substantive provisions of article IX, section 15. If such is the case, the judiciary must adopt a construction that would harmonize them, if possible. *See Colorado Common Cause v. Bledsoe,* 810 P.2d, 201, 212 (Colo. 1991) (Lohr, J., concurring in part and dissenting in part).

Further, a specific constitutional provision controls over a general one. *de'Sha v. Reed,* 194 Colo. 367, 370, 572 P.2d 821 (1977). Here, article IX, section 15 is specific in providing that local school boards "shall have control of instruction in the public schools of their respective districts." This specific provision would control over the general provision that the state may "maintain and support" such schools.

For these reasons, therefore, I conclude that the Charter Schools Act, as amended, violates the local control mandates contained in article IX, sections 15 and 16.

In reaching this conclusion, I have not ignored the evident legislative motive behind the adoption of the amended Act. Surely, that motive was based upon the perception that Colorado's public school system, as created by the 1876 constitution, is not meeting the needs of the twenty-first century. Whether that perception is an accurate one, and if it is, how the system is to be corrected, is at base a policy issue for legislators; it can, in my view, play little, if any, consideration in our role as interpreters of that constitution. If the present constitutional system is inadequate, the solution lies not in a forced interpretation of that constitution, but within the amendment process.